EDWARD RAMBERT, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Professional Construction Company, Appellee).

Second District   No. 2—84—426 WC

Opinion filed May 1, 1985.

George J. Murges, of Murges, Bowman & Corday, of Chicago, for appellant.

Burgeson, Laughlin, Cunningham & Hare, of Chicago, for appellee.

JUSTICE LINDBERG delivered the opinion of the court:

Petitioner, Edward Rambert, appeals from a judgment of the circuit court of Du Page County which confirmed the award of the Illinois Industrial Commission (Commission). The Commission had reduced the arbitrator's award with respect to the period of temporary total disability, the amount of reimbursement for medical expenses,

and petitioner's average weekly wage. In addition, the Commission concluded that the arbitrator had erred in awarding petitioner additional compensation under sections 19(k) and 19(l) of the Workers' Compensation Act (Act) (Ill. Rev. Stat. 1979, ch. 48, pars. 138.19(k), 138.19(l)).

The evidence before the Industrial Commission established that petitioner went to work for respondent, Professional Construction Company, on Tuesday, March 20, 1979. He was employed as an ironworker and worked for his employer for five days before sustaining injuries on March 26 that arose out of and in the course of his employment. On that day, he stepped into an open 55-gallon drum that was sunk in the ground. He stepped into the drum with his left foot. As a result of the accident, he twisted his left and right ankles, jammed his lower back, and injured his shoulder and the top of his hip. He hurt a lot after he fell into the drum.

The following day petitioner visited Hinsdale Sanitarium and Hospital, where he was X-rayed. The X-ray report revealed that petitioner's right ankle, lumbosacral spine, and skull area were all normal. However, a physician at the hospital found an abrasion on the left anterior leg, moderate tenderness of the paraspinous muscles in the back, mild tenderness of the posterior scalp, and tenderness in the right ankle. A physician prescribed a muscle relaxant, which petitioner was still taking occasionally, heat to the lower back, and bed rest for two or three days. The physician released petitioner on March 27 for follow-up care with Dr. Walter Thompson.

Dr. Thompson, a medical doctor, examined petitioner the same day. According to petitioner, the doctor did not prescribe any medication and told him to take it easy and to stay in bed. Dr. Thompson diagnosed petitioner as having multiple contusions, superficial abrasions, and muscle spasms. The doctor's medical report stated that petitioner would be "totally disabled" or "unable to work" from March 27 to March 29, 1979. Petitioner admitted that it was possible Dr. Thompson recommended that he return to work on March 29. In a subsequent letter relating to this examination, the doctor remarked that petitioner had some tenderness over the lumbar spine muscular areas and some residual tenderness in the ankles. The doctor did not discover any evidence of serious musculoskeletal injuries. Although X rays were taken at the emergency room, Dr. Thompson did not have reports of them on March 27; also, he did not order additional X rays.

On April 2 or 3, 1979, petitioner visited Dr. Gialio Bruni, who examined him regarding pain associated with petitioner's lower back and ankles. Dr. Bruni prescribed heat treatments and some medica-

tions. Petitioner saw Dr. Bruni three to five times per week for heat treatments for his lower back and ankles. When petitioner began to experience shooting pain in his legs and severe headaches, the doctor placed him in Northwest Hospital from April 23 to 27, 1979. An electromyogram (EMG) of petitioner's lower extremities and paraspinal muscle was normal, as were X rays of the lumbar spine, right shoulder and ankles. Dr. Bruni discharged petitioner from his care on May 4, 1979.

On May 1, 1979, petitioner was examined at Hines Veteran's Administration (VA) Hospital regarding, among other things, complaints of pain in his back and legs, a fatty tumor behind the right ear, rectal bleeding, weight gain, and a possible tumor in the lung. He received heat treatments and a mild massage of his lower back, treatment he continued for about a month.

At the employer's request, Dr. W. Patrick Smyth conducted an orthopedic examination of petitioner on May 29, 1979. In a letter dated approximately one week later, the doctor stated that petitioner had a fairly high subjective overlay. He walked with an exaggerated camptocormia which suggested an hysterical back syndrome. X rays of his lumbosacral spine were all within normal limits. Petitioner "appeared to have a high subjective complaint of problems with no objective findings whatsoever." After opining that petitioner was quite litigious, the doctor wrote that he could not find anything of significance wrong with petitioner and felt that there was nothing the matter with him. In the doctor's opinion petitioner did not require orthopedic care. In addition, he felt that petitioner could return to work without any restrictions.

In a deposition that was admitted into evidence before the Commission on behalf of the petitioner's employer, Dr. Smyth acknowledged that he did not perform a myelogram or an EMG on petitioner. He stated, in addition, that a myelogram is not necessarily an accurate indicator of the existence of a herniated disc. His deposition testimony also confirmed a number of findings he articulated in his earlier letter. Petitioner's employer terminated temporary total disability payments to petitioner on May 27, 1979, after having paid petitioner compensation in the total amount of $2,235 for a period of 8⁶/₇ weeks.

On June 11, 1979, petitioner visited Dr. Martin Shobris because he was still experiencing shooting pains in his legs; petitioner noticed that he was limping. Dr. Shobris admitted petitioner to Christ Hospital on June 14 and discharged him on June 25. An examination of medical records from Christ Hospital covering this period reveals that the admission diagnosis was slipped-disc syndrome, whereas the dis-

charge diagnosis was acute and chronic lumbosacral muscle strain. X rays demonstrated that the lumbosacral spine was normal. In addition, an EMG of and nerve-conduction findings in the lower extremities and back were normal; there was no evidence of radiculopathy.

Petitioner testified that, while at Christ Hospital, he was placed in traction and given ultrasound therapy twice a day for his lower back. He stated that later he commenced physical therapy at the hospital on an outpatient basis.

After the termination of his outpatient care, petitioner returned to the VA Hospital in July for medical care and treatment. Among other things, the hospital fitted him with bilateral braces for his legs, prescribed a corset for his back, and required that he perform swimming and pelvic-tilt exercises. He continues to wear the braces daily and sometimes uses a cane and the corset. A commissioner of the Industrial Commission personally observed that petitioner used a cane, walked with a limp, and wore braces on both legs.

On July 19, 1979, petitioner underwent an anal fistulectomy at the VA Hospital. On July 27 he again visited Dr. Shobris. In his physician's report of that day, the doctor stated that petitioner would be able to return to work on August 13, 1979; he noted that petitioner had recently undergone an anal fistulectomy. Petitioner did not believe that Dr. Shobris recommended in August 1979 that petitioner return to work.

On February 19, 1980, Dr. Henry Kawanaga examined petitioner. Dr. Kawanaga admitted petitioner to Hinsdale Sanitarium and Hospital from March 10 to 30, 1980. A series of tests was performed in the hospital, including a lumbar myelogram. This was the first myelogram that was performed on petitioner since the March 26, 1979, mishap, although he had a myelogram about five years previous.

According to Dr. Kawanaga, the myelogram revealed that petitioner had a prolapsed disc with a pseudomeningocele. The disc lay anterior to the axillar of the S1 root and was pushing the nerve posteriorly. The myelogram showed amputation of the L5-S1 nerve root on the right side. On March 17 the doctor performed a lumbar laminectomy at the L5-S1 level and removed the prolapsed disc. An earlier examination at the VA Hospital on January 11, 1980, had found a radiculopathy at the L5-S1 level.

Petitioner continued seeing Dr. Kawanaga and visited the VA Hospital for rehabilitation therapy. His ankles still ache, as do his right shoulder and back. Also, he has pain that radiates from his buttocks to his knees. In letters that he wrote in January 1981, Dr. Kawanaga noted that petitioner still experiences post-operative pain. It was the

doctor's recommendation that petitioner refrain from heavy lifting and from prolonged sitting, standing and walking. He stated that petitioner was still disabled and was unable to work due to the continuing pain he was experiencing.

Dr. Smyth reexamined petitioner on January 15, 1981. On this occasion petitioner had a definite neurological defect in the ankle jerk. The doctor stated, however, that he would not have performed a laminectomy on petitioner based upon Smyth's own examination approximately 10 months before Dr. Kawanaga's operation. He added, though, that each surgeon had to make an independent judgment regarding the necessity of surgery. The doctor speculated that much of petitioner's current problems may be secondary to surgical intervention. He remarked, also, that petitioner informed him that the current ankle problems were secondary to an old injury petitioner had suffered. Dr. Smyth opined that petitioner could return to work without restriction now and would be employable in some capacity, but may not do heavy labor again.

Other evidence before the Industrial Commission established that petitioner suffered a prior back injury on April 26, 1977, and, in addition, injured his right ankle and left hand in 1978; petitioner collected money as a result of filing a workers' compensation claim with respect to the 1978 injury. The doctor released him for work in October 1978. In its decision, the Commission found that, with respect to the 1977 accident, petitioner settled for a 25% loss of use of his left leg and a 5% loss of use of his right hand. Regarding the 1978 mishap, the Commission found that petitioner settled for a 20% loss of use of his right foot and a 5% loss of use of his left hand. Although we have been unable to find evidence in the record to support these numerical findings of loss of use, we note that petitioner has not challenged the propriety of these findings.

Petitioner has been an ironworker since 1965 or 1966. He obtained his jobs through his union hall. After he had completed one job, he would report back to the union for new work. He admitted that there were years in which he did not work the entire year. After being released to work in October 1978, he might have worked for one or two days prior to March 20, 1979. One reason he did not work during the winter of 1978-79 was because of the dearth of available construction work; also, he was exercising and trying to get back into shape. He admitted, also, that inclement weather was a factor that affected his work.

On July 28, 1980, the arbitrator determined that petitioner's average weekly wage was $492; that petitioner was entitled to temporary

total disability payments of $31,128 ($328 per week) for 65 weeks, from March 26, 1979, to June 24, 1980; that he should receive additional compensation under section 19(k) of the Act because there had been an unreasonable delay in the payment of compensation; that the employer's failure to pay temporary total disability was without good cause and petitioner was entitled to receive additional compensation in the sum of $10 per day for each day of delay, as section 19(l) of the Act prescribes; and that he should receive $5,584.93 for necessary medical, surgical and hospital services, pursuant to section 8(a) of the Act (Ill. Rev. Stat. 1979, ch. 48, par. 138.8(a)).

On October 16, 1981, the Industrial Commission concluded that petitioner was temporarily totally disabled only from March 26 to May 29, 1979, and that his average weekly wage was $378.46; it awarded him the weekly disability sum of $252.31 for a period of 9¼ weeks. Consequently, the Commission determined that additional compensation under the penalty provisions of sections 19(k) and 19(l) of the Act was inappropriate. Also, the Commission decided that medical treatment after May 29, 1979, was not necessary to cure or relieve the effects of the March 26 accident. The Commission stated that by May 29 Drs. Thompson, Bruni, and Smyth all had performed numerous diagnostic tests and had decided that petitioner could return to work. In addition, the Industrial Commission noted that subsequent treatment by Dr. Shobris and the VA Hospital confirmed the fact that petitioner was not totally disabled as a consequence of the March 26 occurrence. In the Commission's view, the mere fact that he underwent back surgery almost a year after his accident did not signify that the surgery was necessary as the result of the mishap.

The trial court confirmed the decision of the Commission on April 12, 1984. The court determined that the decision of the Commission was not against the manifest weight of the evidence. In particular, the court found the Commission's determination that petitioner failed to establish a causal connection between the accident and the lumbar laminectomy was proper.

REDUCING TEMPORARY TOTAL DISABILITY: MANIFEST WEIGHT OF THE EVIDENCE

■■■ Petitioner's first assertion on review is that the Industrial Commission's reduction of the period of temporary total disability from 65 weeks to 9¼ weeks was against the manifest weight of the evidence. Because this contention and the others petitioner advances in this court assert that the Commission's findings and conclusions were against the manifest weight of the evidence, we recite the well-

established principles governing the review of the Commission's decision.

In a workers' compensation proceeding, the petitioner bears the responsibility of proving his claim by a preponderance of the evidence. (*Republic Steel Corp. v. Industrial Com.* (1980), 82 Ill. 2d 76, 85; *Dunker v. Industrial Com.* (1984), 126 Ill. App. 3d 349, 353, 466 N.E.2d 1255, 1258.) It is the particular function of the Industrial Commission to determine the credibility of the witnesses, to weigh the testimony and to decide the weight to be accorded the evidence. (*Seiber v. Industrial Com.* (1980), 82 Ill. 2d 87, 97; *National Biscuit, Inc. v. Industrial Com.* (1984), 129 Ill. App. 3d 118, 120, 472 N.E.2d 91, 92.) Similarly, the Commission has the responsibility to resolve conflicts in the testimony and to draw reasonable inferences from the evidence. (*Berry v. Industrial Com.* (1984), 99 Ill. 2d 401, 406; *Pieprzak v. Industrial Com.* (1984), 126 Ill. App. 3d 673, 675, 467 N.E.2d 1016, 1018.) In particular, the Commission must choose between conflicting medical testimony (*Rowe Construction Co. v. Industrial Com.* (1984), 128 Ill. App. 3d 365, 370, 470 N.E.2d 1196, 1199; *Kuhl v. Industrial Com.* (1984), 126 Ill. App. 3d 946, 949-50, 468 N.E.2d 162, 164; *Lukasik v. Industrial Com.* (1984), 124 Ill. App. 3d 609, 614, 465 N.E.2d 528, 532) and is entitled to draw reasonable inferences from it (*Aper v. Industrial Com.* (1984), 126 Ill. App. 3d 362, 364, 466 N.E.2d 1368, 1370). A court of review will not disregard permissible inferences merely because other inferences might have been drawn from the same evidence. (99 Ill. 2d 401, 407; 126 Ill. App. 3d 673, 675, 467 N.E.2d 1016, 1018; 126 Ill. App. 3d 362, 364, 466 N.E.2d 1368, 1370.) It is manifest, also, that the Commission is not bound by the arbitrator's finding (82 Ill. 2d 87, 97; 129 Ill. App. 3d 118, 120, 472 N.E.2d 91, 92; *Swindle v. Industrial Com.* (1984), 126 Ill. App. 3d 793, 798, 467 N.E.2d 1074, 1078), and that the Commission's findings and decisions will not be set aside on review unless they are against the manifest weight of the evidence (see 128 Ill. App. 3d 365, 370, 470 N.E.2d 1196, 1199; 126 Ill. App. 3d 946, 950, 468 N.E.2d 162, 165). In addition, that version of the Workers' Compensation Act that was in effect at the time of the petitioner's injury is applicable. 124 Ill. App. 3d 609, 615, 465 N.E.2d 528, 532.

■■ ■ With respect to petitioner's first contention, temporary total disability occurs when an employee is unable to perform any work except that for which no labor market of reasonable stability exists. (*Zenith Co. v. Industrial Com.* (1982), 91 Ill. 2d 278, 287; *Ford Motor Co. v. Industrial Com.* (1984), 126 Ill. App. 3d 739, 742-43, 467 N.E.2d 1018, 1020-21.) The period of temporary total disability ex-

tends from the time the injury incapacitates the employee until the claimant has recovered as much as the character of the particular injury will permit. (*Brinkmann v. Industrial Com.* (1980), 82 Ill. 2d 462, 467; *Kuhl v. Industrial Com.* (1984), 126 Ill. App. 3d 946, 949, 468 N.E.2d 162, 164.) Therefore, compensation for such a disability will be awarded from the time of the injury until the employee's condition has stabilized. (*Caterpillar Tractor Co. v. Industrial Com.* (1983), 97 Ill. 2d 35, 44; 126 Ill. App. 3d 946, 949, 468 N.E.2d 162, 164.) In order to prove temporary total disability, the employee must demonstrate not only that he did not work, but also that he was unable to work. (*Lukasik v. Industrial Com.* (1984), 124 Ill. App. 3d 609, 614, 465 N.E.2d 528, 531.) The fact that the employee is no longer receiving medical treatment or that he or she has the ability to do light work does not preclude a finding of temporary total disability. 126 Ill. App. 3d 739, 743, 467 N.E.2d 1020, 1021.

In the case at bar, Dr. Thompson's medical report stated that petitioner would be totally disabled or unable to work from March 27 to 29, 1979. Petitioner acknowledged that it was possible that the doctor recommended that he return to work on March 29. After his examination of petitioner on May 29, 1979, Dr. Smyth felt that petitioner could return to work without any restriction. In addition, after observing that petitioner had recently undergone an anal fistulectomy, Dr. Shobris stated on July 27, 1979, that petitioner would be able to return to work the following month, on August 13. Petitioner disbelieved that the doctor made this recommendation. In a January 1981 letter, Dr. Kawanaga concluded that, due to post-operative pain, petitioner was disabled and was unable to return to work.

Based on the conflicting evidence summarized above and the reasonable inferences the Commission could have drawn from it, we conclude that the Commission properly determined that petitioner was no longer totally disabled and unable to work after May 29, 1979. (See, *e.g.*, *Lukasik v. Industrial Com.* (1984), 124 Ill. App. 3d 609, 614-15, 465 N.E.2d 528, 532.) Also, we note that here, similarly to the situation involved in *Lukasik*, petitioner failed to present evidence to justify his failure to seek employment after his release for work. In addition, we stress that he has not proffered any medical testimony demonstrating that he was unable to work after May 29, 1979, except for Dr. Kawanaga's letter of January 1981. Therefore, the Commission's decision to terminate temporary total disability payments as of May 29 was not against the manifest weight of the evidence. See 124 Ill. App. 3d 609, 615, 465 N.E.2d 528, 532.

DENIAL OF MEDICAL EXPENSES: MANIFEST WEIGHT OF THE EVIDENCE

■■ Petitioner contends next that the Commission's conclusion that he was not entitled to medical expenses after May 29, 1979, is contrary to the manifest weight of the evidence. In support of his assertion, he places primary emphasis on *Lukasik v. Industrial Com.* (1984), 124 Ill. App. 3d 609, 465 N.E.2d 528, and argues that the Commission's reliance on medical testimony regarding the lack of objective findings of injury was unreasonable. The employer responds that all medical treatment after May 29 was either unnecessary or unrelated to the accident that occurred on March 26.

Petitioner has the burden to establish that his injuries were causally connected to his work-related accident. (*Steiner v. Industrial Com.* (1984), 101 Ill. 2d 257, 261.) In turn, the Commission has the responsibility to decide whether a causal nexus existed between the petitioner's injuries and his industrial mishap. (101 Ill. 2d 257, 260; *Swindle v. Industrial Com.* (1984), 126 Ill. App. 3d 793, 797, 467 N.E.2d 1074, 1077.) In concluding that medical treatment was not necessary after May 29, 1979, to cure or relieve the effects of the March 26 accident, the Commission emphasized that the mere fact that petitioner underwent back surgery almost a year after his mishap did not establish that the surgery was necessary as a consequence of the accident.

The facts of this case are distinguishable from those in *Lukasik* relied upon by the petitioner. In *Lukasik* the accident occurred December 20, 1978, and it was not until nearly a year later that two physicians diagnosed his injury as "muscle spasm secondary to back injury" and "thoracic and lumbosacral muscle spasm and severe pain secondary to back injury." This court observed that there was no conflicting opinion that the myelogram results showed that an injury existed. The court explained that none of the more complex and accurate tests had been taken to confirm the traumatic origins of claimant's complaints of persistent pain. *Lukasik v. Industrial Com.* (1984), 124 Ill. App. 3d 609, 616, 465 N.E.2d 528, 533.

■■ In the instant case at least one of those tests, an EMG, had been made by Drs. Bruni and Smyth and they were both negative. Further, Dr. Smyth opined that an EMG and a myelogram are not always accurate indicators of a herniated disc. More important, however, is that there is no evidence from Dr. Kawanaga, who first diagnosed a prolapsed disc with a pseudomeningocele and nerve amputation, of a causal nexus to the accident. While petitioner complained to Dr. Kawanaga that the accident exacerbated his condition, petitioner acknowledged a long history of back problems. Dr. Ka-

wanaga noted his impression of petitioner's condition as "[b]ack pain of unknown etiology." Based upon our review of all the evidence we conclude that the Commission's decision was not against the manifest weight of the evidence.

### AVERAGE WEEKLY WAGE: MANIFEST WEIGHT OF THE EVIDENCE

■ Petitioner's next assignment of error is that the Commission erred in computing the amount of his average weekly wage under the provisions of section 10(e) of the Act, which applies to employment "in which it is the custom to operate for a part of the whole number of working days in each year" (Ill. Rev. Stat. 1979, ch. 48, par. 138.10(e)). He argues that section 10(c) (Ill. Rev. Stat. 1979, ch. 48, par. 138.10(c)) is the correct statutory provision to be applied in this case.

It is clear that one aim of section 10(e) "is to provide an earnings base for seasonal employees such as construction workers." (*Hasler v. Industrial Com.* (1983), 97 Ill. 2d 46, 51; *Friddle v. Industrial Com.* (1982), 92 Ill. 2d 39, 44.) Thus, this section has been applied to construction workers (*Rowe Construction Co. v. Industrial Com.* (1984), 128 Ill. App. 3d 365, 370-71, 470 N.E.2d 1196, 1199-1200) and persons engaged in slate-roofing (*Ruda v. Industrial Board* (1918), 283 Ill. 550).

In the present case, petitioner admitted that there were occasions when he had not worked the entire year as an ironworker. He had only worked one or two days between October 1978 and his employment with Professional Construction Company, in part due to the unavailability of construction work. Based upon these facts, the Commission's implicit conclusion that petitioner's employment was seasonal was not against the manifest weight of the evidence. Accordingly, the Commission correctly applied section 10(e) in the case at bar to calculate petitioner's weekly wage. (See *Rowe Construction Co. v. Industrial Com.* (1984), 128 Ill. App. 3d 365, 370-71, 470 N.E.2d 1196, 1199-1200.) Petitioner's contention that section 10(c) is the governing provision is unpersuasive. See, *e.g., K. & R. Delivery, Inc. v. Industrial Com.* (1957), 11 Ill. 2d 441.

### DENIAL OF ADDITIONAL COMPENSATION UNDER THE PENALTY PROVISIONS: MANIFEST WEIGHT OF THE EVIDENCE

■ Petitioner's last contention is that the Commission's determination to deny him additional compensation under sections 19(k) and 19(l) of the Act (Ill. Rev. Stat. 1979, ch. 48, pars. 138.19(k), 138.19(l)) was contrary to the manifest weight of the evidence. Specif-

ically, he argues that because the Commission improperly determined that the cutoff period for medical expenses was May 29, it follows naturally that the penalties awarded under sections 19(k) and 19(l) should be reinstated.

The relevant sections of the Act upon which the arbitrator originally based the award of penalties are set forth in our supreme court's recent opinion in *Continental Distributing Co. v. Industrial Com.* (1983), 98 Ill. 2d 407, 413-14, and, therefore, will not be recited here. The clear intent of sections 19(k) and 19(l) is " 'to implement the Act's purpose to expedite the compensation of industrially injured workers and penalize an employer who unreasonably, or in bad faith, delays or withholds compensation due an employee.' " (*Continental Distributing Co. v. Industrial Com.* (1983), 98 Ill. 2d 407, 414, quoting *Avon Products, Inc. v. Industrial Com.* (1980), 82 Ill. 2d 297, 301.) When there is a delay in the payment of compensation, the employer has the burden to demonstrate that it had a reasonable belief that the delay was warranted. (98 Ill. 2d 407, 414; *Board of Education v. Industrial Com.* (1982), 93 Ill. 2d 1, 9.) If an employer relies upon qualified medical opinion and disputes whether the employment was related to the disability, penalties ordinarily are not imposed. *Ford Motor Co. v. Industrial Com.* (1984), 126 Ill. App. 3d 115, 117-18, 466 N.E.2d 1221, 1223.

In harmony with its determination that petitioner was not entitled to temporary total disability payments after May 29, 1979, the Commission correctly reversed the arbitrator's assessment of penalties. The record establishes that petitioner received approximately $2,235 in temporary total disability payments over a period of $8^6/_7$ weeks (from March 26 to May 27, 1979). Because respondent paid in timely fashion all temporary total disability compensation it owed petitioner, penalties under sections 19(k) and 19(l) are unwarranted in the present case. Thus, the decision of the Commission to deny penalties was not contrary to the manifest weight of the evidence.

The court acknowledges receipt and consideration of defendant's reply, ordered by this court at oral argument, to plaintiff's additional authority cited during argument. The judgment of the circuit court of Du Page County confirming the decision of the Industrial Commission is affirmed.

Affirmed.

WEBBER, P.J., and BARRY, KASSERMAN, and SULLIVAN, JJ., concur.