THE VILLAGE OF HOMEWOOD, Appellant, v. THE INDUSTRIAL COMMISSION et al. (Sherry Malum, Appellee).

First District (Industrial Commission Division)   No. 1—87—2494WC

Opinion filed June 8, 1988.

Gordon & Gordon, of Chicago, for appellant.

George L. Gaines, of Chicago, for appellee.

JUSTICE WOODWARD delivered the opinion of the court:

Claimant, Sherry Malum, filed an application for adjustment of claim, alleging injuries sustained in her employment on March 8, 1978. The arbitrator found that she was temporarily totally disabled for a period of 18⁴/₇ weeks and that petitioner, Village of Homewood, was liable for payment of medical services up to July 18, 1978.

On review, the Industrial Commission held that claimant was temporarily totally disabled for a period of 101³/₇ weeks, entitled to $53,718.55 in medical expenses, and permanently disabled to the ex-

tent of 40% of a person under section 8(d)2 of the Workers' Compensation Act (Ill. Rev. Stat. 1985, ch. 48, par. 138.8(d)(2)). The circuit court of Cook County confirmed the Commission's decision, and this appeal followed. We affirm.

On appeal, the petitioner argues that the manifest weight of the evidence does not support the following: (1) claimant's condition of ill-being was causally connected to the incident of March 8, 1978; (2) claimant was disabled for a period of 101³/₇ weeks; (3) the medical bills totaling $53,718.55 were reasonable and necessary; and (4) the claimant was permanently disabled to the extent of 40% of the person as a whole.

On March 8, 1978, claimant was working for the petitioner as a radio dispatcher. One of her job responsibilities was to search female subjects who had been arrested and brought into the Homewood police station. At approximately 4 a.m., claimant was ordered to search a female offender, arrested for driving under the influence. No police officers were present in the room where the search was to take place. The woman refused to be searched and shoved claimant several times against a door. The offender then threw claimant over a chair, the arm of which struck the latter's tailbone. Claimant landed on her knees and hands and the left side of her head slammed into a wall. Police officers then entered the room and subdued the subject.

Claimant was admitted to South Suburban Hospital the following day complaining of headaches, light-headedness, nausea, and chest contusions. She remained hospitalized until March 24, 1978. On March 29, 1978, claimant was rehospitalized for continuing complaints regarding head, neck, and chest pain to April 11, 1978. She was placed under medication and received physical therapy to her head and cervical spine.

During this second hospitalization, Dr. William Padamadan, claimant's treating physician, asked Dr. William Schmidt, a neurosurgeon, to examine claimant. Dr. Schmidt diagnosed her condition as postconcussion syndrome.

Following her April 11, 1978, discharge, claimant remained off work and under the care of Drs. Schmidt and Padamadan. She received physical therapy, including ultrasound to her head, chest, and neck. Claimant also received nerve block injections in the temple for headaches, nausea, and dizziness.

She was rehospitalized on April 14, 1978, through May 6, 1978, and from May 19, 1978, through May 25, 1978, for the same persistent complaints. She returned to work from July 17, 1978, to July 21, 1978, but was unable to perform her duties satisfactorily. While at

work, she experienced severe headaches, trouble even sitting because of tenderness in her tailbone, numbness in her legs, and aching in her shoulders. Dr. Padamadan ordered that she remain off work and reenter the hospital on July 27, 1978.

On January 22, 1979, Dr. Schmidt performed an anterior fusion on claimant's cervical spine. In June 1979, claimant returned to petitioner's employment, working limited hours as a radio dispatcher. During work, she experienced continuing problems with tingling sensations in her hands and arms, along with neck and head pain.

In September 1979, claimant was readmitted to the hospital, complaining of numbness and tingling in her upper extremities and hands. Dr. Ramesh Adiga, a peripheral vascular surgeon, diagnosed claimant as having thoracic outlet syndrome, which he subsequently determined to be a secondary effect of claimant's cervical spine problems. After conservative therapy failed to alleviate the symptoms, surgery was performed to remove one rib and resection another. Following this surgery, claimant did not return to work for petitioner.

■ Initially, petitioner urges that the record shows no causal connection between claimant's continuing complaints of ill-being and the March 8, 1978, incident. We note that the burden is on a claimant to prove that an injury was causally related to her employment. (*Newgard v. Industrial Comm'n* (1974), 58 Ill. 2d 164.) In determining whether the claimant has met her burden of proof, the Commission is not bound by the arbitrator's findings and may properly determine the credibility of the witnesses, weigh their testimony, and assess the weight to be given to the evidence. (*Rambert v. Industrial Comm'n* (1985), 133 Ill. App. 3d 895.) A reviewing court may only overturn the Commission's factual determinations when they are against the manifest weight of the evidence. *Berry v. Industrial Comm'n* (1984), 99 Ill. 2d 401.

■ In support of this first issue, petitioner argues the following:

Prior to the March 8, 1978, incident, claimant made numerous complaints to treating physicians concerning her health. Those complaints included dizziness, light-headedness, headaches, tunnel vision, problems swallowing, stomach pain, and tingling and numbness in her upper extremities. Subsequent to the March 8, 1978, incident, her initial complaints were much the same as her prior complaints, *e.g.*, dizziness, light-headedness, nausea, and vomiting. After the numerous surgical procedures, the last of which occurred on September 10, 1980, the claimant still complained of headaches, numbness in her arms and hands, pain in her neck and shoulders. Petitioner asserts that claimant's condition was substantially the same prior to the in-

jury as following it.

Dr. Arieff, who examined claimant at the petitioner's request, was the only psychiatrist to testify in this matter; he stated that claimant's problems were mental, not physical. Dr. Arieff opined that her problems started long before the injury on March 8, 1978, and that there was no evidence the assault aggravated any organic conditions. Dr. Marshall Matz, a board-certified neurosurgeon who examined claimant twice at petitioner's behest, diagnosed her subjective complaints as being hypochondriacal or psychological in nature and not related to any organic or neurological problems. He thought that all her symptoms were due to an underlying emotional problem that had led to a repetitious multitude of subjective complaints. Dr. James Milgram, a board-certified orthopedic surgeon, also examined the claimant at petitioner's request. He reviewed the hospital records and medical treatments and found no objective evidence of any injuries whatsoever. Also, claimant's treating physicians, Dr. Padamadan and Dr. Chavez, noted her psychological problems and the lack of objective findings to support claimant's subjective complaints.

In finding that a causal relationship exists between claimant's conditions of ill-being and the injuries sustained on March 8, 1978, the Commission based its decision on the testimony of Drs. Schmidt and Adiga. At the arbitration hearing, Dr. Schmidt had testified that in his opinion such a causal relationship did exist. However, in reaching this opinion, Dr. Schmidt failed to consider the claimant's history of complaints and psychological problems prior to the incident, as he was unaware of that history at that time. He also testified that the claimant's difficulties might not have been related to the injury if she had the same complaints and findings as before. He further indicated that symptoms of hysterical reaction included dizziness, nausea, and pain in the neck and head.

The Commission also relied on the testimony of Dr. Adiga, who testified that the claimant's condition of thoracic outlet syndrome was causally related to the injuries sustained on March 8, 1978. Dr. Adiga also failed to obtain the claimant's history prior to the accident, and, in fact, based his diagnosis, treatment, and opinion solely on the claimant's subjective complaints. He further testified that the lack of pain in the neck at the time of the initial injury would be indicative that the claimant's condition of ill-being might not be a result of the trauma of March 8, 1978, and could be the result of something else.

Petitioner contends that a careful examination of the record reveals that the testimony of Drs. Schmidt and Adiga were incomplete

opinions, which were not based on a reasonable degree of medical certainty, and, consequently, they failed to uphold the finding of a causal relationship.

Conversely, claimant responds that the record clearly shows a causal connection. Regarding claimant's physical problems prior to the disputed incident, she was hospitalized twice, once for an appendectomy and once for gallstones, neither of which were psychogenically based disorders.

In response to petitioner's assertions that the operations performed on claimant were based solely on claimant's subjective complaints, claimant points to the following evidence.

Dr. Schmidt testified that he performed cervical myelogram on the claimant on November 29, 1978. He saw an abnormality in the myelogram, i.e., "a protrusion of the ripple in the column on the posterior aspect of the vertebral body." On January 18, 1979, Dr. Schmidt gave claimant saline disc injections from C-4 to C-7. These were administered to determine the actual pain associated with any of the relevant intracervical discs. Claimant had positive reaction to the injection between C-5 — C-6; it was apparent from his testimony that Dr. Schmidt did not believe such a reaction could be feigned. Because of this positive reaction, Dr. Schmidt determined that claimant's neck pain was objectively based and, therefore, performed an anterior fusion of the cervical discs. Dr. Schmidt testified that, based on reasonable degree of medical certainty, a causal relationship existed between claimant's condition of ill-being and the injuries sustained on March 8, 1978.

Dr. Ramesh Adiga, a surgeon of peripheral vascular surgery, testified by deposition on April 7, 1980. He was asked by Dr. Schmidt to examine the claimant. Dr. Adiga explained that when claimant was admitted to the hospital on September 14, 1979, she had pain in both arms, pain in the back of the neck and shoulder, and tingling and numbness in the right hand and arm. On September 17, 1979, he performed a number of tests, including the hyperabduction arm stress test, costoclavicular test, and the Addson test; the results of each were "positive." Also, the EMG test performed by the hospital's neurological department indicated an abnormal finding. Based upon the test results, complaints, and history, Dr. Adiga diagnosed thoracic outlet compression syndrome, i.e., an irritation of the brachial plexus due to the compression between the first rib and the clavical.

Dr. Adiga concluded that claimant's thoracic outlet syndrome was a secondary result of the March 8, 1978, injury. He indicated that it

is common to see this syndrome occur following the type of injury that claimant sustained. He opined that spasms in the claimant's neck and upper body caused the space between the clavical and the rib to narrow. This compression caused irritation, pain, tingling, numbness, coldness, and heaviness in the arms and back of the neck, in addition to occipital headaches, and pain in the scapula area.

Conservative treatment of the condition failed, and Dr. Adiga performed surgery, which consisted of removal of 1½ of her right ribs in order to alleviate the compression.

Dr. William Padamadan, an internist who first saw claimant on March 3, 1977, and treated her after March 8, 1978, stated that the initial symptoms of neck pain and dizziness were related to her work injury. He concurred with Dr. Schmidt's final diagnosis of post-concussion syndrome, which accounted for claimant's recurring symptoms of headaches, vomiting, and weakness of upper extremities. Dr. Padamadan stated that claimant's medical condition had dramatically worsened since the March 8, 1978, incident.

On October 10, petitioner sent claimant to Dr. Joseph Monaco for a physical examination in order to determine her fitness for further employment. Among Dr. Monaco's findings were the following. Claimant had a markedly limited range of her cervical spine with only 20 degrees rotation, the 10 degrees lateral bending, and 20 degrees extension and flexion. The muscles in claimant's upper extremities exhibited significant weakness. Claimant's responses to pinprick in her upper extremities were dull. X-ray findings indicated the displacement of the anterior of the distal segment of the coccyx.

Dr. Monaco informed petitioner that it would "not be a good idea" for claimant to return to work in view of her multiple complaints regarding her lower back.

Petitioner cites *Board of Education v. Industrial Comm'n* (1981), 83 Ill. 2d 475, as controlling this case. In *Board of Education,* our supreme court found that the claimant's subjective complaints were not reflected in any objective evidence. The claimant had been examined by and received treatment from numerous physicians, none of whom found objective evidence of claimant's subjective reports. In addition, the court found that the pains, which claimant contended arose from the injury, were present prior to her employment.

Petitioner argues the facts of *Board of Education* are similar to the instant case; in that claimant's symptoms preceded the alleged injury and they are not substantiated by objective findings. As noted above, petitioner contends that the testimony of Drs. Schmidt and Adiga is based on incomplete information as to claimant's medical/

psychological history and, therefore, is defective and not credible.

We note that although there are similarities between *Board of Education* and the instant case, the former does not control here. There are sufficient objective findings to buttress claimant's subjective complaints.

Dr. Schmidt performed a cervical myelogram which indicated an abnormality. Some months after the myelogram, he injected several of claimant's cervical discs with a saline solution. The results of the test were positive, *i.e.*, they provided objective evidence of claimant's subject complaints regarding her neck. Based on these objective results, Dr. Schmidt performed an anterior fusion on claimant's cervical spine.

Rather than relying solely on claimant's subjective complaints, Dr. Adiga performed numerous objective tests, the results of which indicated thoracic outlet syndrome. Despite conservative therapy, claimant's condition did not improve, and Dr. Adigo removed several ribs to alleviate claimant's symptoms.

We find the record demonstrates sufficient objective findings, namely, the tests of Drs. Schmidt and Adiga which indicated intra-cervical disc damage and thoracic outlet syndrome, to support claimant's subjective complaints. Accordingly, there is sufficient evidence to support the Commission's finding of a causal connection between claimant's condition of ill-being and the March 8, 1978, incident.

■ Petitioner next contends that the Commission's award of 101³/₇ weeks of temporary total disability (TTD) and $53,718.55 necessary and reasonable medical expenses was contrary to the manifest weight of the evidence. Due to our determination that the Commission's findings with respect to causal relation was not against the manifest weight of the evidence, we hold that the findings in respect to the reasonableness and necessity of the medical bills and the TTD awarded claimant are not against the manifest weight of the evidence.

■ Petitioner's final contention is that the finding of the Commission that claimant is permanently disabled to the extent of 40% under section 8(d)(2) of the Act is against the manifest weight of the evidence. It argues that the record contains no evidence that should cause the Commission to conclude that claimant is permanently disabled. This assertion is not supported by the record. In his deposition of February 12, 1982, Dr. Schmidt stated that claimant's condition of ill-being was permanent. In October 1980, Dr. Joseph Monaco stated to petitioner that claimant could not return to work. Dr. Adiga testified that as of December 1979 claimant could not have returned to

860

work. From this evidence, the Commission was entitled to find claimant permanently disabled to the extent of 40% under the Act.

For the reasons stated above, we affirm the judgment of the circuit court of Cook County.

Affirmed.

BARRY, P.J., and McNAMARA, McCULLOUGH, and CALVO, JJ., concur.