JAMES LUSIETTO, Appellant, v. THE INDUSTRIAL COMMISSION *et al.*
(W. S. Bills & Sons, Appellee).

Third District (Industrial Commission Division)   No. 3—87—0661WC

Opinion filed August 30, 1988.

Anthony C. Raccuglia, of Anthony C. Raccuglia & Associates, of Peru, for appellant.

James Lannon, of Herbolsheimer, Lannon, Duncan & Reagan, P.C., of La Salle, for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

Petitioner James Lusietto sought worker's compensation benefits for injuries sustained while working for respondent W. S. Bills & Sons. An arbitrator found that claimant's average weekly wage was $504. The arbitrator awarded temporary total disability benefits of 186 weeks at $329.81 per week and $247.36 per week for 130 weeks as permanent partial disability benefits for 60% of a man as a whole, and medical benefits. Both parties sought review.

The Industrial Commission found the average weekly wage was $416.92, and granted temporary total disability benefits at the rate of $277.95 for 78 1/7 weeks. The Commission also awarded permanent partial disability benefits, at the rate of $247.36 per week, for 130 weeks for the loss of use of 32 1/2% of each leg. The circuit court of La Salle County confirmed the Commission's decision. Petitioner appeals.

On appeal, petitioner contends that the Commission's reduction of the number of weeks of temporary total disability was against the manifest weight of the evidence; that the Commission's finding of the extent of permanent and partial disability was against the manifest weight of the evidence; that the Commission erred in using the back injury as the basis for finding the loss of the use of a leg, and in considering credit for prior injuries; and that the Commission erred in its determination of the applicable average weekly wage.

Petitioner testified that prior to the accident at issue here, he suffered a back injury in 1970 for which he received a worker's compensation settlement representing 50% loss of the use of a leg. In 1975 he suffered another back injury and received a worker's compensation settlement representing a 35% loss of the use of a leg.

On May 6, 1979, petitioner, an ironworker, twisted his body and fell while using a 70- to 80-pound wrench to tighten rods in a furnace

at work. He sustained the injury for which he now makes claim. Petitioner has not worked for respondent since that day. The following day, petitioner sought medical treatment for his back, which ultimately required surgery in September 1979. Petitioner testified that he continued to suffer from a significant amount of pain. He could participate in no physical activities. It hurt to walk or stand, and he could not lift.

Petitioner testified that his wife owned a business, Portable Welding and Construction. She began the business seven years prior to his accident. Following the accident, petitioner earned no income from Portable Welding and did not work for it in any capacity. Petitioner testified that he went to the Portable Welding offices on a daily basis. He sometimes answered the telephone, and he occasionally visited worksites. He spoke with insurance representatives about Portable Welding's insurance coverage. Petitioner denied being manager of Portable Welding.

Bernadette Lusietto, petitioner's wife, testified on behalf of petitioner that she began Portable Welding in 1976. In regard to a newspaper article naming petitioner as manager, she denied having given anyone that information. Her husband did not work for Portable Welding. He merely answered the telephone on occasion, and she would "talk to him on occasion because he is an iron worker."

Larry Mussato, a representative of Illinois Valley Contractors Association, testified for petitioner that he had participated in negotiating construction contracts in the area with various building trades. The average hourly rate for ironworkers was $13.19 plus fringe benefits.

Patricia Gerrond, an insurance representative, testified for respondent that in September 1982 her company received a written request to quote insurance to Portable Welding. She made an appointment and met with petitioner to discuss the possible types of insurance the business needed.

An October 26, 1981, report written by Dr. James Wilson, an orthopedic surgeon, was introduced into evidence by petitioner. Dr. Wilson stated that he examined petitioner on that day. Petitioner had pain in his low back and in both legs. He complained of occasional numbness and tingling in his legs. Petitioner had recovered to the maximum extent possible. The restricted motion and neurological deficits were permanent. Dr. Wilson did not believe petitioner would ever be able to return to any type of gainful employment which involved manual labor.

Dr. Robert Fitzgerald, an orthopedic surgeon, testified on behalf

of petitioner by means of an evidence deposition. Dr. Fitzgerald treated petitioner at Mayo Clinic beginning on June 5, 1979. Petitioner had tenderness over the scar on his low back from previous surgery, and the fusion mass was not solid. After more conservative treatment failed, Dr. Fitzgerald performed a surgical refusion of the fourth and fifth lumbar vertebrae on September 20, 1979. Dr. Fitzgerald then instructed petitioner to return in three months. No treatment was prescribed.

In September 1980, Dr. Fitzgerald released petitioner for work. He could perform a sedentary job with no climbing or lifting objects weighing more than 25 to 30 pounds. In February 1981, petitioner returned to Dr. Fitzgerald complaining that his lower back pain was worse. On February 25, 1981, he was placed in a body cast. After its removal on April 13, 1981, the pain returned.

In regard to the extent and cause of petitioner's disability, Dr. Fitzgerald testified that, following refusion surgery, petitioner had a solid fusion, but had persistent pain which was probably related to the scar tissue. No further medical treatment would completely resolve the persisting problems. The condition was permanent.

On review before the Commission, petitioner testified that he continued to experience constant pain in his lower back and right hip and numbness in his feet. He returned to Dr. Fitzgerald on July 25, 1983. Dr. Fitzgerald's report indicated that the fusion remained solid, the neurological condition was unchanged, and there was no reason for additional surgical intervention.

Petitioner first contends that the Commission's finding as to the period of time he was temporarily totally disabled was against the manifest weight of the evidence. Petitioner relies upon the arbitrator's finding that the disability period was 186 weeks, *i.e.*, from May 6, 1979, through December 2, 1982. Respondent first relied upon a stipulation which resulted in its paying for 156²/7 weeks, *i.e.*, May 6, 1979, through November 15, 1980, and April 13, 1981, through September 20, 1982. Respondent now relies upon the Commission's finding that petitioner was temporarily totally disabled for 78¹/7 weeks, *i.e.*, May 6, 1979, through September 15, 1980, and February 24, 1981, through April 13, 1981.

The time during which a worker is temporarily totally disabled presents a question of fact for the Commission to decide. (*Lukasik v. Industrial Comm'n* (1984), 124 Ill. App. 3d 609, 465 N.E.2d 528.) The Commission's decision will not be disturbed unless it is against the manifest weight of the evidence. *Lukasik v. Industrial Comm'n* (1984), 124 Ill. App. 3d 609, 465 N.E.2d 528.

In the present case, petitioner was clearly disabled from the date of the accident until Dr. Fitzgerald released him for work on September 15, 1980. Evidence that a physician released an employee for work, even for light duty, may support the Commission's decision that the duration of temporary disability had ended. (See, e.g., Boker v. Industrial Comm'n (1986), 141 Ill. App. 3d 51, 489 N.E.2d 913.) There is no medical evidence of any disability following that time, until the body cast was put on in February 1981 and removed in April 1981.

Evidence of petitioner's involvement in Portable Welding also tended to show that he was working and thus not disabled for the claimed time period. He stated that he was at Portable Welding every day. Petitioner admitted that he answered Portable Welding's telephone. Moreover, he would meet with salespeople who came in to sell products. Petitioner denied going out and estimating or supervising jobs for Portable Welding.

Petitioner testified about Portable Welding's job at Mobil Chemical in late fall 1980. The workers would meet at 6:30 a.m. and go to work together. Petitioner met with the workers every day in a restaurant where they would have coffee. Sometimes he then accompanied the workers to the Mobil Chemical plant.

Petitioner also conceded that he spoke with insurance representatives on behalf of Portable Welding. Gerrond testified that her company received a written request for insurance consultation, and that request named petitioner as the contact person. Gerrond and another representative went to Portable Welding and met with petitioner. They walked around various other parts of the building and were accompanied only by petitioner. Gerrond saw petitioner's wife, who was sweeping the floor, but she did not recall her making any comment about the insurance.

The insurance representatives asked petitioner questions such as what kind of jobs the company performed, the radius of jobsites, and other information to help determine what kind of insurance the business needed. During the hour they were there, it was necessary to refer to Portable Welding's records. Petitioner was always able to obtain the necessary records, which were kept in a file cabinet next to where petitioner sat in the office.

Another indication of petitioner's involvement concerned whether he earned money from Portable Welding. Petitioner testified that he earned nothing after the accident. He seemed unsure of who worked there. When asked if his wife worked following the accident, petitioner replied, "Yes, I imagine so." Moreover, petitioner testified that

after Portable Welding's accountant prepared the financial statements petitioner would go through them. The financial reports and tax returns indicated a significant increase in income following petitioner's accident.

■ Petitioner points to respondent's purported admission on the request for hearing sheet, or stipulation sheet, that petitioner was disabled for 156²/₇ weeks. Petitioner maintains that the Commission erred in ignoring this admission. The parties cannot by stipulation bind the Commission. See *Neal v. Industrial Comm'n* (1986), 141 Ill. App. 3d 289, 490 N.E.2d 124.

We hold that the Commission's decision as to the nature and extent of petitioner's temporary total disability is not against the manifest weight of the evidence.

■ Petitioner next contends that the Commission's finding as to the nature and extent of the permanent disability is against the manifest weight of the evidence. Petitioner maintains that he is 100% permanently disabled. It is the province of the Commission to determine the nature and extent of an employee's disability, particularly where conflicting medical evidence is presented. (*Peavey Co. Flour Mills v. Industrial Comm'n* (1976), 64 Ill. 2d 252, 356 N.E.2d 36; *Wallace v. Industrial Comm'n* (1983), 98 Ill. 2d 33, 455 N.E.2d 92.) The Commission's determination on this issue will be disturbed only if it is against the manifest weight of the evidence. *Bishop v. Industrial Comm'n* (1980), 78 Ill. 2d 315, 399 N.E.2d 1326.

■ Petitioner points to Dr. Wilson's opinion that petitioner "would [n]ever be able to return to any type of gainful employment involving manual labor." Dr. Fitzgerald testified that petitioner would not be able to carry out any type of manual labor. Dr. Fitzgerald's testimony, however, clearly indicates that as of September 15, 1980, petitioner was capable of working, with some restrictions. Following the September surgery, Dr. Fitzgerald prescribed no treatment. Dr. Fitzgerald found that the "deep pain that [petitioner] had previously experienced had been relieved." He saw no muscle spasms. He concluded that petitioner had some neuroma, which is injury to the nerves in the area where the incisions were made. Dr. Fitzgerald released petitioner to return to work at a sedentary job with no climbing or lifting objects weighing more than 25 or 30 pounds. He wrote, "I seriously doubt that [petitioner] will be able to carry out any type of heavy manual work. However, should it be possible for him to work in a more sedentary capacity as an ironworker, it would indeed be possible for him to be actively employed."

Dr. Fitzgerald emphasized, however, that petitioner could go to

worksites and supervise, or make estimates. Dr. Fitzgerald noted that, as with most back surgery patients, following the September 1979 surgery, petitioner was able to return to a sedentary job within six months and manual work, with the noted limitations, within one year. Petitioner was released to work in September 1980, 16 months after the accident.

Thus, the ruling that petitioner failed to prove 100% permanent disability was not against the manifest weight of the evidence. The evidence permitted the Commission to find that petitioner performed sedentary work at Portable Welding, strongly suggesting that he was not totally disabled. See *Edwards v. Industrial Comm'n* (1983), 96 Ill. 2d 221, 449 N.E.2d 1330.

Petitioner next contends that the Commission erred as a matter of law in deciding this case on the basis of the loss of use of the legs, and also erred in giving the employer a credit for prior compensation awards.

■ The arbitrator noted that petitioner had twice previously received benefits as the result of back injuries. In 1970, petitioner received permanent partial benefits for the loss of 50% of one leg. In 1975, petitioner received permanent partial benefits for the loss of 35% of one leg. The arbitrator then awarded benefits for the additional disability to the back and legs. In total, petitioner's "body as a whole" was found to be presently disabled to the extent of 60% disability under section 8(d)(2). Under that section, the employee receives compensation for that percentage of 500 weeks that the partial disability resulting from the injuries covered by this paragraph bears to the total disability. (Ill. Rev. Stat. 1985, ch. 48, par. 138.8(d)(2).) Sixty percent of 500 weeks is 300 weeks. Deducting the previous awards pursuant to section 8(e)(17), the arbitrator awarded 130 weeks of benefits for the new, additional disability.

■ The Commission chose a different method to arrive at the same compensatory result. Under the schedule set forth in section 8(e)(12), the loss of the use of a leg results in compensation for 200 weeks. The Commission used this section 8(e) schedule instead of the section 8(d)(2) "body as a whole" provision. It found that, in addition to the prior awards of compensation, petitioner had lost 32½ of the use of each leg. The 1970 loss of 50% of one leg, or .50 times 200 weeks, is 100 weeks. The 1975 loss of 35% of one leg, or .35 times 200 weeks, is 70 weeks. The loss of 32½% of one leg, or .325 times 200 weeks, is 65 weeks. Sixty-five weeks for each leg, therefore, are 130 weeks of benefits awarded for the new, additional disability. The 130 weeks of benefits, together with the 100 weeks and the 70 weeks

of benefits previously awarded, totaled 300 weeks. Thus, the arbitrator and Commission arrived at the same result.

Respondent questions whether, as a matter of law, the Commission can use the 200-week schedule leg benefit as the basis for the award here. Schedule allowances were originally exclusive. A strong trend, however, now views schedule allowances as nonexclusive. (See *General Electric Co. v. Industrial Comm'n* (1982), 89 Ill. 2d 432, 433 N.E.2d 671; see generally 2 A. Larson, Workmen's Compensation §58.23, at 10—344.86 (1987); 37 Ill. L. & Prac. *Workers' Compensation* §125, at 383 (1987).) Instead of simple losses compensated strictly on the schedule value of the listed members, the loss or impairment could be compensated on the percentage disability of the body as a whole, or of a general disability. (See 2 A. Larson, Workmen's Compensation §58.23, at 10—344.86 (1987).) A claimant may have an option, therefore, which will result in an award more favorable than a schedule award. See, *e.g.*, *General Electric Co. v. Industrial Comm'n* (1982), 89 Ill. 2d 432, 433 N.E.2d 671.

The typical statute provides for both the total body's disability and the specific schedule benefits for the loss of the use of a leg, without mandating that either is exclusive. (2 A. Larson, Workmen's Compensation §58.23, at 10—344.100 (1987).) We conclude that the Commission did not err in awarding benefits under the schedule as it did here.

■ Having concluded that the Commission was entitled to use the section 8(e) schedule instead of the section 8(d)(2) "body as a whole" provision, we consider whether the Commission properly allowed the respondent credit for the previous "leg" injury awards. In *Killian v. Industrial Comm'n* (1986), 148 Ill. App. 3d 975, 500 N.E.2d 450, this court held that under the statute the employer receives a credit only where the injury is to the same "member." Section 8(e)(17) provides that for the permanent partial loss of the use of any of the listed members, for which compensation was paid before the accident for which he now claims compensation, that loss must be taken into consideration and deducted from any award for the subsequent injury. (Ill. Rev. Stat. 1985, ch. 48, par. 138.8(e)(17); see also *General Motors Corp., Fisher Body Division v. Industrial Comm'n* (1975), 62 Ill. 2d 106, 338 N.E.2d 561 (employer receives credit where injury to same member); see generally 37 Ill. L. & Prac. *Workers' Compensation* §131, at 399 (1987).) In *Killian*, a prior award was for a "back" injury. Because the statute does not list a "back" as a "member," the present "back" injury could not be an injury to the same "member," and thus no credit was awarded.

Similarly, in *Page Enterprises, Inc. v. Industrial Comm'n* (1980), 78 Ill. 2d 287, 399 N.E.2d 1312, the first injury was to the "back," but surgery resulted in a pain-free condition. Consequently, the court held that the Commission's decision implicitly found the second accident, which resulted in "new" back and leg pain and which required more back surgery, did not involve the same "member" as the previous injury.

 In the present case, the prior awards were for "leg" injuries, and the present award is for "leg" injuries. Because "legs" are listed as "members," and the present injury is to the same members, the credit was properly awarded.

In *Isaacs v. Industrial Comm'n* (1985), 138 Ill. App. 3d 392, 485 N.E.2d 1093, the employer received no credit where the first accident resulted in an award for a 20% loss of use of the right leg. The injury at issue resulted in an award for benefits for 30% disability of the person under section 8(d)(2). The Commission then deducted an 8% credit from the 30% permanent disability award. The disputed 8% credit was an extrapolation of the earlier back injury which resulted in the 20% loss. The court found the Commission could not allow a credit for a previous back injury by extrapolating this prior injury, a 20% loss of use of a leg under section 8(e), into an 8% disability to the person under section 8(d)(2). Here, the Commission avoided making such an extrapolation by awarding benefits under section 8(e) in both cases.

The extent of a disability is a question of fact within the peculiar province of the Industrial Commission. (*Bishop v. Industrial Comm'n* (1980), 78 Ill. 2d 315, 399 N.E.2d 1326; *Consolidated Freightways, Inc. v. Industrial Comm'n* (1976), 64 Ill. 2d 312, 356 N.E.2d 51.) We find no error here.

 Petitioner finally contends that the Commission erred as a matter of law in applying section 10(e) instead of section 10(c) of the Act. Moreover, he argues it was against the manifest weight of the evidence to determine that section 10(e) applied and that the average weekly wage was $416.92.

Section 10(c) provides that if the worker was not employed by the same employer for the full year immediately preceding the accident, the compensation shall be computed according to the annual earnings which persons of the same class, in the same employment and same location earned during such period. Ill. Rev. Stat. 1979, ch. 48, par. 138.10(c).

In contrast, section 10(e) provides that in types of employment where the custom is to operate "for a part of the whole number of

working days in each year, such number, if the annual earnings are not otherwise determinable, shall be used instead of 300 as a basis for computing the annual earnings, provided the minimum number of days which shall be so used for the basis of the year's work shall be not less than 200." (Ill. Rev. Stat. 1979, ch. 48, par. 138.10(e).) This section provides an earnings base for seasonal employees. *Rambert v. Industrial Comm'n* (1985), 133 Ill. App. 3d 895, 477 N.E.2d 1364; *Hasler v. Industrial Comm'n* (1983), 97 Ill. 2d 46, 454 N.E.2d 307; *Friddle v. Industrial Comm'n* (1982), 92 Ill. 2d 39, 440 N.E.2d 865.

Petitioner testified that he was unemployed for most of the year prior to his injury because ironwork was slow in the winter. That year particularly had been bad. At the time of the accident, he had only earned $3,094 that year. Petitioner testified that his average hourly union wage was $13.55 per hour for a 40-hour week during the year prior to the occurrence.

Mussato's testimony did not indicate the work was anything other than seasonal, since he testified as to an average hourly wage, not an average weekly or annual wage for ironworkers. The Commission was entitled to find that petitioner's work was seasonal and thus calculate his earning base under section 10(e). (See *Rambert v. Industrial Comm'n* (1985), 133 Ill. App. 3d 895, 477 N.E.2d 1364.) Neither this argument nor other points raised by petitioner convince us that the Commission erred in determining the proper earning base. See *Reynolds v. Industrial Comm'n* (1986), 151 Ill. App. 3d 695, 502 N.E.2d 1178.

For the foregoing reasons, the judgment of the circuit court of La Salle County, confirming the decision of the Industrial Commission, is affirmed.

Judgment affirmed.

BARRY, P.J., and WOODWARD, McCULLOUGH, and CALVO, JJ., concur.