THOMAS BUSAYTIS, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Commonwealth Edison Company, Appellee).

Third District (Industrial Commission Division)   No. 3—87—0742WC

Opinion filed January 30, 1989.

Noel C. Lindenmuth and Richard A. Kimnach, both of Anesi, Ozmon, Lewin & Associates, Ltd., of Chicago, for appellant.

Leslie Z. Koczur, of Commonwealth Edison Company, of Chicago, for appellee.

PRESIDING JUSTICE BARRY delivered the opinion of the court:

The arbitrator found that the petitioner, Thomas Busaytis, had failed to prove that he had suffered a compensable, permanent disability as a result of a work injury. The Industrial Commission affirmed the arbitrator's decision. The circuit court confirmed the Commission's decision. The petitioner appeals.

The parties stipulated that on September 1, 1979, the petitioner suffered accidental eye and face injuries arising out of and in the course of his employment. Regarding that accident, the petitioner testified before the arbitrator that he was working as a control system technician for the respondent Commonwealth Edison, when a three-quarter inch plug shot out of an air dryer, striking his left eye. Cylinder gel and crystal beads also shot out of the dryer and into both of his eyes. A hospital emergency room physician cleaned his face and eyes, prescribed eye medicine and told him to come back the next day

to see ophthalmologist John Minier.

Hospital medical records introduced into evidence showed that the emergency room physician found multiple foreign bodies in both of the petitioner's eyes. His right eye had multiple abrasions on the cornea. His left eye also had multiple abrasions, with evidence of corneal edema and hyphema. The petitioner's right eye vision was 20/25, while his left eye vision was 20/200.

The petitioner further testified that the next day Dr. Minier examined him and told him to continue using the prescribed medicine and return in two days. Dr. Minier examined the petitioner several more times, prescribed bed rest and referred him to ophthalmologist Graham Dobbie.

Dr. Minier's medical records introduced into evidence showed that following the accident the petitioner had a subconjunctival hemorrhage laterally in his right eye. By September 7, 1979, the right eye hemorrhage was receding. The left eye was clear and the pupil widely dilated. Dr. Minier reported that as of September 18, 1979, both eyes were normal, with each showing 20/20 vision. On September 27, 1979, the petitioner returned to Dr. Minier, complaining of pain and a sandy feeling in his left eye. On January 8, 1980, the petitioner returned complaining of flashing pain in his left eye and a droopy left eyelid.

Dr. Dobbie's medical records in evidence show that he examined the petitioner on October 2, 1979, finding that the petitioner's right eye looked fine and that he had vision of 20/25 in it. His left eye vision was 20/30-2. Dr. Dobbie noted that there was evidence of glaucoma in the left eye and recommended that the petitioner be checked for it periodically. Upon reexamining the petitioner on January 15, 1980, Dr. Dobbie reported that "the sluggishness of the pupil is the result of the old injury. This may eventually come back to fairly normal function, but only time will tell."

The petitioner testified that since 1980 he had been seeing ophthalmologist Paul Sternberg at least once every two months. Dr. Sternberg's medical records in evidence show that he examined the petitioner on February 28, 1980. At that time, the petitioner's right eye ocular tension was 20 mm.Hg., while the left eye tension was 26 mm.Hg. (We note that other evidence in the record shows a normal ocular tension range to be 11 mm.Hg. to 21 mm.Hg. Tensions above 21 mm.Hg. indicate the presence of glaucoma.) Dr. Sternberg prescribed an antiglaucoma drug for the petitioner's left eye. Continued use of the drug has maintained the petitioner's left eye tension within the normal range. In an October 12, 1983, report, Dr. Sternberg stated: "Glaucoma in the left eye probably is the result of an acciden-

tal injury which had occurred while at work."

The petitioner testified that he had no dilation or constriction problems in either eye prior to the injury; he did not wear glasses before the injury; and he had never suffered from glaucoma. He further stated that at the time of the arbitration hearing he suffered from extreme light sensitivity, blind spots in his left eye, poor overhead vision and "shooting stars" in his left eye. He now wears prescription glasses.

The petitioner introduced into evidence the medical reports from his yearly, work-required examinations. The June 29, 1979, report showed that his left eye vision was 20/25 far and 20/30 near, while his right eye vision was 20/20 far and 20/30 near. The ocular tension in his right eye was 16 mm.Hg.; the left was 20 mm.Hg.

The June 27, 1980, report showed left eye vision of 20/70 far and 20/100 near, while his right eye vision was 20/20 far and 20/40 near. With glasses, the left eye was 20/25 far and 20/30 near, while the right eye was 20/20 far and near. Ocular tension in his right eye registered 24 mm.Hg. The left eye registered 25 mm.Hg.

Reports for the next two years showed essentially the same vision, except that the right eye's unaided vision had worsened to 20/70 near by the May 25, 1982, test. Ocular tension in 1981 and 1982 was 21 mm.Hg. in the right eye and 23 mm.Hg. in the left eye.

At the respondent's request, the petitioner twice visited ophthalmologist Samuel M. Schall. In a September 11, 1981, letter, Dr. Schall reported that he had examined the petitioner and found his unaided vision to be 20/30 in the right eye and 20/60 in the left. With glasses, the petitioner's vision was 20/20 right, 20/20 left. Ocular tension registered 20 mm.Hg. in the right eye, 18.5 mm.Hg. in the left eye. Dr. Schall estimated that the petitioner had lost less than 5% of his vision, though the doctor noted that the glaucoma might result in a worse ultimate prognosis.

Dr. Schall reported in a July 21, 1984, letter that he had again examined the petitioner and found unaided right eye vision of 20/25, correctable with glasses to 20/20, and left eye vision of 20/50, correctable to 20/25. The right eye ocular tension was 25 mm.Hg. The left eye was 27 mm.Hg. Dr. Schall noted that "with the onset of the suspicion of glaucoma in the right eye, which had not been injured, it must be considered that possibly patient has had glaucoma potential which is now showing up in his right eye." The doctor further stated that the left eye had deteriorated since the 1981 examination. He estimated that the petitioner had lost 20% to 25% of his left eye vision.

The arbitrator found that the petitioner had failed to prove that

any compensable permanent disability was sustained from the work injury. The arbitrator based his conclusion on "No residual loss. Eye glasses only."

During the proceedings before the Commission, the petitioner testified that he was still employed in his same job. He had continued seeing Dr. Sternberg every two months for his left eye, but had not needed any treatment for his right eye. The petitioner also introduced into evidence before the Commission two letters from Dr. Sternberg, dated October 14, 1985, and April 4, 1986. Dr. Sternberg reported that as of September 27, 1985, the petitioner's corrected vision in both eyes was 20/20. The antiglaucoma drug was keeping the petitioner's left eye ocular tension at 20 mm.Hg. The right eye also registered a tension of 20 mm.Hg.

The parties waived their right to have a full panel decide the case on review. Commissioner Ted Black, Jr., ruled that although the petitioner showed he had glaucoma in his left eye, he failed to prove that any loss of vision was causally related to the accidental injuries of September 1, 1979, or that he had sustained any permanent disability due to those injuries. The circuit court confirmed Commissioner Black's decision.

On appeal, the petitioner argues that the Commission's determination that he failed to prove that his eye problems were related to his work injury was against the manifest weight of the evidence. Specifically, the petitioner argues that he presented unrefuted direct and inferential evidence that his current left eye problems, including reduced vision, glaucoma and light sensitivity, were caused by his work injury. According to the petitioner, the direct evidence includes Dr. Sternberg's statement that the glaucoma probably resulted from the injury. The inferential evidence includes Dr. Dobbie's statement that the sluggish pupil resulted from the injury, as well as the medical reports and testimony showing a normal left eye prior to the injury, followed by rapid deterioration after the injury.

The only possible basis for the Commission's decision, states the petitioner, was Dr. Schall's opinion that the petitioner may have had a potential for glaucoma. The petitioner notes, however, that Dr. Schall found only a suspicion of glaucoma in the right eye and the record shows that glaucoma in fact never materialized in that eye. Further, contends the petitioner, Dr. Schall's suggestion of a preexisting glaucoma potential was based on his erroneous belief that the petitioner's right eye was not injured in the September 1, 1979, work accident.

The petitioner therefore argues that the instant case does not actually present a manifest weight issue. Instead, the petitioner con-

tends that all of the evidence supports his claim that his left eye problems were caused by his work injury. In support of his position, the petitioner cites *Dean v. Industrial Comm'n* (1986), 143 Ill. App. 3d 339, 493 N.E.2d 16. In *Dean*, this court noted that if a claimant supports causation with unrebutted expert medical testimony, a reviewing court may set aside the arbitrator's and the Commission's decisions. The *Dean* court went on to hold that Dean was entitled to compensation, finding that to decide otherwise would allow the Commission either to substitute its opinion for or to simply disregard pertinent testimony of the sole medical expert. The court stated that that would be equivalent to allowing the Commission to draw unauthorized medical inferences from unintroduced adverse medical evidence, when the Commission could have exercised its authority to appoint an independent medical examiner. 143 Ill. App. 3d 339, 493 N.E.2d 16.

The respondent contends that less than three weeks after the work injury, Dr. Minier found that the petitioner's eyes were completely normal. Further, the respondent suggests that Dr. Dobbie's October 2, 1979, concern over the petitioner's potential for glaucoma was not unusual given the petitioner's July 2, 1979, eye examination showing a left eye tension of 20 mm.Hg., on the high end of the normal 11 mm.Hg. to 21 mm.Hg. range. Finally, noting Dr. Schall's opinion regarding the petitioner's potential for glaucoma, the respondent concludes that the Commission's decision was not against the manifest weight of the evidence.

██ █ It is axiomatic that the petitioner has the burden of proving that his injury was causally related to his employment (*Newgard v. Industrial Comm'n* (1974), 58 Ill. 2d 164, 317 N.E.2d 524); that the Commission has the sole province of judging the credibility of witnesses (*Watts v. Industrial Comm'n* (1979), 77 Ill. 2d 30, 394 N.E.2d 1171), resolving evidentiary conflicts and determining the facts (*Goldblatt Brothers, Inc. v. Industrial Comm'n* (1979), 78 Ill. 2d 62, 397 N.E.2d 1387); and that the Commission's decision will not be set aside on review unless it is against the manifest weight of the evidence (*Rambert v. Industrial Comm'n* (1985), 133 Ill. App. 3d 895, 477 N.E.2d 1364).

In the instant case, the evidence presented before the arbitrator and the Commission was limited to the petitioner's testimony; the medical records of the hospital, Dr. Minier, Dr. Dobbie, Dr. Sternberg and Dr. Schall; and the reports from the petitioner's yearly employment physicals. Dr. Sternberg offered the only direct opinion on causality, stating that the petitioner's glaucoma probably resulted from his work injury.

The basis of the Commission's decision is not entirely clear, but it appears that the only possible bases were Dr. Schall's opinion of a preexisting glaucoma potential and the July 2, 1979, physical showing a left eye tension of 20 mm.Hg. In this regard, Dr. Schall merely stated that the suspicion of glaucoma in the right eye indicated the possibility that the petitioner had a potential for glaucoma. The record shows that Dr. Schall's suspicion may have been erroneous, since glaucoma has not developed in the right eye. Additionally, his basic assumption that the right eye was not injured was clearly erroneous, given the hospital's and Dr. Minier's records showing multiple abrasions and hemorrhaging in the right eye.

Further, the unrefuted evidence shows that prior to the accident, the petitioner's ocular tensions in both eyes were within the normal range. The respondent's argument that the 20 mm.Hg. reading in the left eye indicated a predisposition toward glaucoma has no basis in the record. While this might be true, only a medical expert could competently testify that a high reading in the normal tension range indicates a predisposition for glaucoma. Given the lack of such testimony and the clear indication that 20 mm.Hg. is normal, it would have been improper for the Commission to have inferred that the preaccident test showed a predisposition for glaucoma. As noted in *Dean*, the Commission should have appointed its own medical expert if it wished to know the significance of a 20 mm.Hg. reading.

■ Further, even if the petitioner had a preexisting potential for glaucoma, that would not necessarily contradict Dr. Sternberg's opinion that the left eye glaucoma resulted from the injury. As the petitioner notes in his reply brief, if an industrial activity aggravates or accelerates a preexisting disease, compensation is available under the Workers' Compensation Act. (Ill. Rev. Stat. 1985, ch. 48, par. 138.1 *et seq.*; *Doyle v. Industrial Comm'n* (1981), 86 Ill. 2d 544, 427 N.E.2d 1223.) Thus, Dr. Schall's suggestion that the petitioner had a preexisting potential for glaucoma does not actually rebut Dr. Sternberg's opinion that the accident triggered the actual onset of glaucoma.

■ The petitioner's evidence of a causal relationship between his injury and his left eye glaucoma is not especially strong, but he established a *prima facie* case of causality. While examination of the record shows that the respondent offered no direct evidence rebutting the petitioner's causal connection, the Commission has the power to draw proper inferences from the evidence. However, the instant record shows Dr. Schall's erroneous assumption that the right eye was not injured, Dr. Schall's mere "suspicion" of glaucoma, a failure for glaucoma to actually manifest itself in the right eye, and normal ocular

tension readings before the injury. We therefore conclude that the Commission's determination that the petitioner failed to prove a causal connection between his work injury and his current left eye problems was erroneous as a matter of law.

The petitioner next argues that the Commission's determination that he suffered no permanent disability as a result of his work injury was against the manifest weight of the evidence.

The petitioner cites the evidence in the record regarding his loss of vision and argues that he demonstrated that he has suffered at least some degree of permanent disability in his left eye. Accordingly, contends the petitioner, a decision which denies him any benefits for permanent disability is a decision against the manifest weight of the evidence.

The respondent's argument is, as the petitioner points out in his reply brief, simply a continuation of its contention that the petitioner did not prove a causal connection between his injury and his glaucoma. In fact, the respondent admits that its examining physician, Dr. Schall, noted that as of July 21, 1984, the petitioner had lost 20% to 25% of his vision due to the glaucoma.

It appears uncontroverted that the petitioner has suffered a permanent partial loss of vision. In fact, the Commission's decision does not seem to say that the petitioner has not suffered a permanent partial loss of vision. It merely states that the loss of vision was not caused by his work accident. Accordingly, we remand this cause with instructions for the Commission to determine not the existence of permanent loss of vision, but only the extent of the permanent loss.

The judgment of the circuit court of Will County confirming the Commission's determination that the petitioner's current left eye problems were not caused by his work injury is reversed. The cause is remanded for determination of the extent of the petitioner's permanent loss and the proper amount of compensable medical expenses.

Reversed and remanded.

McNAMARA, WOODWARD, McCULLOUGH, and LEWIS, JJ., concur.