LONNIE McDANELD, Appellant, v. THE INDUSTRIAL COMMISSION *et al.*
(Kell Community Fire Department, Appellee).

Fifth District (Industrial Commission Division)  No. 5—98—0564WC

Opinion filed October 1, 1999.

Robert C. Nelson, of Nelson & Nelson, of Belleville, for appellant.

D. Keith Short, of Belleville, for appellee.

JUSTICE COLWELL delivered the opinion of the court:

Claimant, Lonnie McDaneld, twisted his knee while working as a volunteer fireman for respondent, Kell Community Fire Department. In October 1995, an arbitration hearing was held on claimant's application for adjustment of claim. After the arbitrator rendered an award partially in his favor, claimant appealed. The Industrial Commission (Commission) modified the arbitrator's decision, awarding

claimant temporary total disability (TTD) benefits, permanent partial disability (PPD) benefits, and medical expenses pursuant to sections 8(b), 8(e), and 8(a), respectively, of the Workers' Compensation Act (Act) (820 ILCS 305/8(b), (e), (a) (West 1992)). The circuit court of Clinton County confirmed, and claimant appeals. On appeal, claimant maintains that the Commission erred in calculating his average weekly wage and that the Commission's TTD and PPD awards were against the manifest weight of the evidence. We affirm.

On November 1, 1993, the day he twisted his knee, claimant was working three jobs: part-time as a volunteer fireman, full-time as a carpenter, and part-time as a life insurance salesman. Claimant also worked on his 55-acre farm and his mother's 80-acre farm, raising cattle and cultivating crops.

Claimant began working as a volunteer fireman for respondent around 1975. He worked 10 to 15 hours a week for respondent but never received wages for his work. At some point claimant became a supervisor/fire chief, though in that position he continued fighting fires.

As a carpenter, claimant remodeled buildings and built additions on homes. By October 1993 he was learning to do finishing work, which was "lighter" work than remodeling was. His boss was named James Watts. Claimant made himself available to Watts eight hours a day, five days a week, and testified that he worked "at least eight hours" a day for Watts. However, according to claimant, because of weather, absence of materials, and absence of work, he did not always work every day of the week. Claimant missed "more than five days of work with Mr. Watts" in the year preceding his injury.

Watts paid claimant $7.50 per hour, and tax forms revealed that claimant earned $4,717.23 working for Watts from January 1, 1993, to October 31, 1993 (a period of 44 weeks). Claimant introduced no evidence of his earnings from Watts prior to January 1, 1993, and the record is unclear as to exactly when claimant began working for Watts. Respondent did not possess claimant's employment record with Watts, and it therefore did not introduce any evidence on the matter.

Claimant began selling life insurance part-time for Franklin Life Insurance (Franklin) in 1992. On November 1, 1993, claimant was operating under a written contract with Franklin which stated that claimant was an independent contractor. (Accordingly, in calculating claimant's average weekly wage, the arbitrator excluded claimant's earnings from Franklin.) On November 19, 1993, claimant signed a new contract with Franklin which made him a full-time salesman. Franklin paid claimant on a commission-only basis. Claimant earned $2,926.96 from Franklin in 1992 and $3,630.46 in 1993. As of October

1995, he was earning over two times more money as a full-time salesman than he earned as a part-time salesman.

On November 1, 1993, claimant was in the fire department when a call came in. He ran through a doorway to his truck, turned, and twisted his left knee. Claimant was taken to St. Mary's Hospital in Centralia for X rays. The St. Mary's staff concluded that claimant suffered a left knee sprain.

Because the pain in his left knee did not subside, claimant visited Dr. Behrooz Heshmatpour, an orthopedic specialist, on November 6. Dr. Heshmatpour ordered an MRI, which revealed a complete tear of the medial meniscus of the left knee and degenerative arthritis. According to Dr. Heshmatpour, the arthritic condition of claimant's left knee preceded claimant's injury. Dr. Heshmatpour performed surgery on claimant's meniscus on November 23, 1993. Claimant underwent physical therapy through December 1993, missing one day of therapy. Dr. Heshmatpour questioned claimant's compliance with the physical therapy recommendations he gave.

Claimant visited Dr. Heshmatpour on January 19, 1994. Dr. Heshmatpour's notes from that day stated that claimant "may return back to light work with limited walking and stair climbing." Dr. Heshmatpour next saw claimant on April 14, 1994, and concluded that the surgery was a success. He discharged claimant and indicated that claimant had reached his maximum medical improvement.

On May 17, 1994, Dr. William Costen examined claimant at the request of respondent. Claimant complained of pain in his left knee, especially when squatting or going up stairs. Dr. Costen opined that claimant had reached his maximum medical improvement and that he needed no further medical treatment. Dr. Costen advised claimant that he could continue performing his supervisory duties as a fire chief but that he should avoid heavy fire-fighting work. Furthermore, since claimant's carpentry work required him to climb ladders and squat, Dr. Costen found it appropriate that claimant avoid that work as well.

Claimant returned to Dr. Heshmatpour on August 11, 1994, still complaining of left knee pain. Dr. Heshmatpour examined claimant, and the results were normal. Claimant saw Dr. Heshmatpour again in September 1995, and Dr. Heshmatpour concluded that there was nothing seriously wrong with claimant's knee. The doctor instructed claimant to stretch his left hamstring and quadriceps.

At Dr. Heshmatpour's request, claimant underwent a physical capacity evaluation at St. Mary's Hospital in March 1995. The evaluation showed that claimant's movement patterns and behaviors correlated with his pain profile.

As of the October 1995 hearing, claimant was experiencing

increased pain with weather changes. He could neither kneel on nor squat with his left knee, and he testified that he had difficulty carrying more than 40 pounds of weight. Claimant had not attempted to return to carpentry work since November 1993. He did, however, return to his fire chief position with respondent. Claimant stated that he avoids the heavy fire fighting but that he can perform such work when no other firefighters are available.

Claimant also returned to farming work in April 1994. He testified that he planted crops upon his return and that he harvested the crops and took them to market in the fall of 1994. His testimony suggests that, in October 1995, he was able to repair the farm machinery, feed his cattle by hand, and load his truck.

The arbitrator rendered her decision in May 1996 and determined that claimant's average weekly wage was $109.70. She reached that figure by dividing $4,717.23 (claimant's earnings from Watts from January 1 to October 31, 1993) by 43 (44 weeks minus five days of missed work). The arbitrator thus awarded claimant $105.50 per week in TTD benefits for 11$^1/_7$ weeks, as well as $576 in medical expenses and $83.20 per week in PPD benefits for 60 weeks for a 30% loss of use of his left leg. See 820 ILCS 305/8(a), (b), (e) (West 1992). Claimant appealed.

The Commission modified the arbitrator's decision, finding claimant entitled to 80 weeks of PPD benefits for a 40% loss of use of his left leg. It otherwise affirmed and adopted the arbitrator's decision, and the circuit court of Clinton County confirmed. Regarding the computation of claimant's average weekly wage, the circuit court stated that "the rate question is a question of law that would be best reviewed by the appellate court." Claimant timely appealed.

■ Claimant's first contention on appeal is that the Commission erred in its determination of his average weekly wage. Section 10 of the Act (820 ILCS 305/10 (West 1992)) sets forth the basis for calculating a claimant's compensation. It provides, in pertinent part, as follows:

"The compensation shall be computed on the basis of the 'Average weekly wage' which shall mean the actual earnings of the employee in the employment in which he was working at the time of the injury during the period of 52 weeks ending with the last day of the employee's last full pay period immediately preceding the date of injury, illness or disablement excluding overtime, and bonus divided by 52; *but if the injured employee lost 5 or more calendar days during such period, whether or not in the same week, then the earnings for the remainder of such 52 weeks shall be divided by the number of weeks and parts thereof remaining after the time so lost*

*has been deducted. Where the employment prior to the injury extended over a period of less than 52 weeks, the method of dividing the earnings during that period by the number of weeks and parts thereof during which the employee actually earned wages shall be followed.* \*\*\* In the case of volunteer firemen \*\*\*, the income benefits shall be based on the average weekly wage in their regular employment." (Emphasis added.) 820 ILCS 305/10 (West 1992).

The parties agree that on November 1, 1993, Watts was claimant's regular employer and that only claimant's earnings from Watts should be used to calculate his average weekly wage.

■ A claimant bears the burden of establishing his average weekly wage under section 10 of the Act. *Ricketts v. Industrial Comm'n*, 251 Ill. App. 3d 809, 810 (1993). Assuming compliance with section 10, the Commission's determination of a claimant's average weekly wage is an issue of fact which will not be set aside unless it is contrary to the manifest weight of the evidence. *Smith v. Industrial Comm'n*, 170 Ill. App. 3d 626, 631 (1988).

The claimant in *Smith* worked intermittently for the employer in the year preceding his leg injury, earning $2,692.58 during that period. However, during the 5$^{1}$/7 weeks prior to his injury, the claimant worked full-time for the employer and earned $1,194.26. The Commission found that the second full sentence of section 10 (employment lasting less than 52 weeks) applied; it therefore calculated the claimant's average weekly wage by dividing $1,194.26 by 5$^{1}$/7. *Smith*, 170 Ill. App. 3d at 629. We affirmed this method of calculation, stating, "[T]he Industrial Commission took the pay stubs, which it considered to be the only precisely verifiable measure of the number of weeks claimant worked, and divided this number into claimant's regular earnings during this period." *Smith*, 170 Ill. App. 3d at 631-32.

In *Cook v. Industrial Comm'n*, 231 Ill. App. 3d 729 (1992), the claimant earned $10,266.42 from his employer in the year preceding his injury. He worked 24 weeks during that year, but only 3 of the 24 weeks were full, 40-hour weeks. During most weeks, claimant worked fewer than five days and often less than eight-hour days. *Cook*, 231 Ill. App. 3d 729. The Commission computed the claimant's average weekly wage by dividing $10,266 by 24 (the number of weeks the claimant actually worked). Finding that the second part of the first sentence of section 10 (employee worked 52 weeks but missed five or more days) applied, we held that the Commission's calculation was not against the manifest weight of the evidence. *Cook*, 231 Ill. App. 3d 729.

■ In this case, claimant earned $4,717.23 from Watts between January 1, 1993, to October 31, 1993, a period of 44 weeks. Claimant testified that he missed at least five days of work in the year preceding

his injury. The Commission, in adopting the decision of the arbitrator, calculated claimant's average weekly wage by dividing $4,717.23 by 43 (44 weeks minus five days of missed work), to yield a figure of $109.70. Clearly, this method of computation complied with section 10 of the Act, no matter whether the second part of the first sentence (as in *Cook*) or the second sentence (as in *Smith*) of section 10 applies. A calculation under either part of the statute yields the same figure ($109.70), since both calculations require that the same numerator ($4,717.23) and the same denominator (43) be used.

Claimant cites three cases—*D.J. Masonry Co. v. Industrial Comm'n*, 295 Ill. App. 3d 924 (1998), *Peoria Roofing & Sheet Metal Co. v. Industrial Comm'n*, 181 Ill. App. 3d 616 (1989), and *McCartney v. Industrial Comm'n*, 174 Ill. App. 3d 213 (1988)—in an attempt to show that the Commission erred in its calculation of his average weekly wage. We find all three cases to be factually distinguishable from the instant case. In both *D.J. Masonry* and *Peoria Roofing*, the claimants introduced evidence of the exact number of days they worked during the previous year. From that number, the Commission could properly determine the total number of weeks the claimants actually worked and use that figure as the denominator in calculating the claimants' average weekly wages. *D.J. Masonry*, 295 Ill. App. 3d at 932; *Peoria Roofing*, 181 Ill. App. 3d at 618. Here, however, claimant presented no evidence of the number of days he actually worked during the 44 weeks in question. Instead, the only relevant evidence before the Commission was the following: that claimant earned $4,717.23 from Watts from January 1 to October 31, 1993, and that claimant missed at least five days of work during the year preceding his injury.

In *McCartney*, the Commission determined the claimant's average weekly wage by dividing the claimant's past year's earnings by 52. Nonetheless, since the claimant had been laid off for a significant part of the year, and since such layoffs were common in the industry, we remanded the matter to the Commission for a recalculation of average weekly wage. *McCartney*, 174 Ill. App. 3d at 214-16. *McCartney* has no application toward the instant case, since claimant was employed continuously by Watts from January through October 1993. Indeed, the record even suggests that claimant began working for Watts well before January 1993. However, neither claimant nor respondent, which did not possess any of Watts' employment records, introduced evidence of the exact length of claimant's employment with Watts.

Claimant also urges us to use a "multiplication method" to determine his average weekly wage. Claimant's argument is simply this: the Commission should have multiplied his hourly wage rate

($7.50) by the number of hours he was scheduled to work per week (40), to yield an average weekly wage of $300. Nonetheless, we reject this suggested method, as it is not the one prescribed by the statute. Furthermore, since claimant was not being paid during "down time" (weekday hours spent not working for Watts), we fail to see why that time should be included in the average weekly wage calculation. *Cf. Ricketts*, 251 Ill. App. 3d at 811 ("[t]here is no presumption that a workweek for every employee in the labor force is 40 hours"). Claimant's reliance on *Illinois-Iowa Blacktop, Inc. v. Industrial Comm'n*, 180 Ill. App. 3d 885 (1989), is misplaced. In that case, we affirmed the Commission's determination of average weekly wage where the Commission multiplied the claimant's hourly wage rate by the number of hours he worked to determine his preceding year's earnings. The Commission did this only because the claimant's employer underpaid him during that year. *Illinois-Iowa Blacktop*, 180 Ill. App. 3d at 889-90. Such was not the case here.

Claimant presents one last argument on the average weekly wage issue. He claims that the Commission should have calculated his average weekly wage by using only claimant's October 1993 employment figures. In that month he worked 122.5 hours and earned $919.25. Claimant reasons that since he was working more regularly for Watts in October 1993 and since his carpentry skills were improving, his October 1993 earnings most accurately reflect what his average weekly wage would have been after October. He also emphasizes Watts' testimony that claimant would probably have been earning $10 to $12 per hour in October 1995.

We find no merit in claimant's argument. We would be remiss to allow a claimant to "pick and choose" which portion of a pay period to be used to calculate his average weekly wage. Section 10 makes clear that if a claimant worked during a large portion of the year preceding his injury, the Commission shall calculate the claimant's average weekly wage by dividing his *actual regular earnings* by the *"period"* during which he worked. See 820 ILCS 305/10 (West 1992); *Smith*, 170 Ill. App. 3d at 631 ("the only substantive difference between the computation of the average weekly wage of short or casual employments and other employments is that *actual regular weekly earnings* are used to determine the latter, whereas probable regular weekly earnings are used to determine the former" (emphasis added)). Since the 44-week pay period in question cannot be regarded as a "short or casual" employment, the Commission correctly calculated claimant's average weekly wage based on the actual earnings claimant made during that period.

We next turn to claimant's contention that the Commission erred

in terminating his TTD benefits as of January 19, 1994, the date when Dr. Heshmatpour released him to light-duty work. Claimant maintains that he was not able to return to his carpentry job with Watts after the accident. According to claimant, he was totally disabled until either April 14, 1994, or May 17, 1994, when Drs. Heshmatpour and Costen respectively opined that he had reached maximum medical improvement. Evidence of his inability to work after January 1994, asserts claimant, was that he did no farm work until April 1994 and that he returned to Dr. Heshmatpour in August 1994 with complaints of pain in his left knee.

■ Whether a claimant is entitled to TTD benefits and for how long is a question of fact to be determined by the Commission, and a reviewing court will not disturb that determination unless it is contrary to the manifest weight of the evidence. *Manis v. Industrial Comm'n*, 230 Ill. App. 3d 657, 660 (1992). Interpretation of medical testimony is particularly the function of the Commission. *Freeman United Coal Mining Co. v. Industrial Comm'n*, 286 Ill. App. 3d 1098, 1103 (1997).

■ An employee is temporarily totally incapacitated from the time an injury incapacitates him from work until such time as he is as far recovered or restored as the permanent character of injury will permit. *Archer Daniels Midland Co. v. Industrial Comm'n*, 138 Ill. 2d 107, 118 (1990). In order to show TTD, a claimant must show not only that he did not work but also that he was unable to work. *Ingalls Memorial Hospital v. Industrial Comm'n*, 241 Ill. App. 3d 710, 716 (1993). A TTD award is proper when the claimant cannot perform any services except those for which no reasonably stable labor market exists. *Ingalls*, 241 Ill. App. 3d at 716, citing *Zenith Co. v. Industrial Comm'n*, 91 Ill. 2d 278, 287 (1982).

■ We find that the evidence supports the Commission's award of TTD benefits from November 2, 1993, to January 19, 1994. Dr. Heshmatpour released claimant to light-duty work on January 19, 1994. At that time, claimant was under contract as a full-time insurance salesman for Franklin. Both claimant and Dr. Heshmatpour regarded the sales job as "light duty employment." However, claimant did not resume working for Franklin until February or March 1994, and he provided no explanation why. Certainly the arbitrator's implication that claimant should have begun working for Franklin after January 19 was well-founded. Since claimant could have worked full-time as an insurance salesman immediately after January 19, 1994, the Commission's decision to terminate TTD payments as of that date was not against the manifest weight of the evidence. See *Ingalls*, 241 Ill. App. 3d at 716 (when claimant can work in "reasonably stable labor mar-

ket," TTD payments should cease); *Lukasik v. Industrial Comm'n*, 124 Ill. App. 3d 609 (1984) (doctor released claimant, a dock worker, for light-duty work on particular date, and Commission terminated TTD payments on that date; appellate court affirmed Commission's decision as to TTD benefits).

■ Finally, claimant challenges the Commission's 80-week PPD award for a 40% loss of use of his left leg pursuant to section 8(e) of the Act (820 ILCS 305/8(e) (West 1992)). Claimant maintains that the Commission instead should have awarded him compensation for a percentage of a loss of the "man as a whole" pursuant to section 8(d)(2) of the Act (820 ILCS 305/8(d)(2) (West 1992)). As a person who "has historically worked in occupations that require heavy and rigorous work," claimant asserts that, due to his injury, he "lost his ability to work in his chosen profession as a carpenter." He also states that the injury affected claimant's ability to work as a farmer. Since, according to claimant, he is now capable of performing only moderately light work duties, he is entitled to section 8(d)(2) benefits.

It is the province of the Commission to determine the nature and extent of a claimant's disability, and that factual determination will not be set aside unless it is contrary to the manifest weight of the evidence. *Palmer House v. Industrial Comm'n*, 200 Ill. App. 3d 558, 563 (1990). Again, the interpretation of medical testimony falls uniquely within the province of the Commission. *Freeman United*, 286 Ill. App. 3d at 1103. To be entitled to section 8(e) benefits for the loss of use of a part of the human body, a claimant must show that the use of that particular member has been impaired. *A.O. Smith Corp. v. Industrial Comm'n*, 69 Ill. 2d 240, 244-45 (1977). Where the evidence supports a PPD award based on a percentage of loss of use of a member, the Commission is not required to award benefits based on a disability of the claimant's "body as a whole." *Lusietto v. Industrial Comm'n*, 174 Ill. App. 3d 121, 128-29 (1988).

Since suffering his knee injury, claimant now works full-time for Franklin and continues to work as a fire chief. Although he avoids heavy fire-fighting work, he stated that he can perform the strenuous work when no other firefighters are available. Dr. Heshmatpour testified that claimant's left knee condition did not prevent him from engaging in lighter carpentry work, though the doctor also stated that heavy activity could result in the need for additional knee surgery at a date earlier than otherwise would be expected. Furthermore, when claimant went to Dr. Heshmatpour in September 1995 complaining of leg knee pains, Dr. Heshmatpour concluded that there was nothing "seriously wrong" with claimant. In addition, there was testimony adduced that, despite the fact that Watts still had work available well af-

ter November 1993, claimant never asked for his job back. Also of significance is that claimant can still perform substantial farming work. He emphasizes nothing in the way of a reduction in recreational activities or of a loss of earning capacity as a result of his injury. Based on the facts before us, we find that it was well within the Commission's discretion to award claimant benefits under section 8(e) rather than under section 8(d)(2). See *Lusietto*, 174 Ill. App. 3d at 128-29.

We therefore hold that the Commission's decision as to average weekly wage, TTD benefits and PPD benefits was not against the manifest weight of the evidence.

Affirmed.

McCULLOUGH, P.J., and RAKOWSKI, HOLDRIDGE, and RARICK, JJ., concur.