2017 IL App (3d) 160363WC

Opinion filed June 16, 2017

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

WORKERS' COMPENSATION COMMISSION DIVISION

_____

| | | |
|---|---|---|
| SCOTT HOLOCKER, | ) | Appeal from the Circuit Court |
| | ) | of the Tenth Judicial Circuit |
| | ) | Peoria County, Illinois |
| Plaintiff-Appellant, | ) | |
| | ) | |
| | ) | |
| v. | ) | Appeal No.   3-16-0363WC |
| | ) | Circuit No.   15-MR-343 |
| ILLINOIS WORKERS' COMPENSATION | ) | |
| COMMISSION, *et al.*, (Komatsu America | ) | Honorable |
| Corporation), | ) | Katherine Gorman, |
| | ) | Judge, Presiding. |
| Defendants-Appellees). | ) | |

_____

PRESIDING JUSTICE HOLDRIDGE delivered the judgment of the court, with opinion.
Justices Hoffman, Hudson, Harris, and Moore concurred in the judgment and opinion.

_____

**OPINION**

¶ 1     The claimant, Scott Holocker, filed an application for adjustment of claim under the

Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2012)), seeking benefits for

work-related injuries he sustained on September 11, 2012, while he was working for Komatsu

America Corporation (employer).  Following a hearing, an arbitrator found that the claimant was

entitled to receive temporary total disability (TTD) benefits from the time he was terminated by

the employer until the date of arbitration, a period of 15 and 1/7 weeks.  The arbitrator denied the

claimant's claims for penalties and attorney fees.

¶ 2    The claimant and the employer each sought review of the arbitrator's decision before the Illinois Workers' Compensation Commission (Commission). The claimant appealed the arbitrator's calculation of his average weekly wage and the denial of his claims for penalties and attorney fees. The employer appealed the arbitrator's award of TTD benefits and also appealed the arbitrator's calculation of the claimant's average weekly wage. The Commission unanimously reversed the arbitrator's award of TTD benefits and its calculation of the claimant's average weekly wage, and affirmed the arbitrator's denial of penalties and attorney fees.

¶ 3    The claimant then sought judicial review of the Commission's decision before the circuit court of Peoria County. The circuit court reversed the Commission's denial of TTD benefits and adopted the arbitrator's award of TTD benefits. The court also reversed the Commission's calculation of the claimant's average weekly wage and affirmed the Commission's denial of penalties and attorney fees.

¶ 4    This appeal followed.

¶ 5                          BACKGROUND

¶ 6    The claimant worked for the employer as a "transportation operator" at the employer's manufacturing facility in Peoria, Illinois. His duties included operating a 40-ton overhead crane. On September 11, 2012, the claimant was operating the crane, placing together heavy steel sections for an oversized mining truck. Each of the steel sections weighed several tons, and they were secured by a chainmail strap. After placing a steel section on the mining truck, the claimant was retracting the loosened chainmail strap when it got stuck. As the claimant looked up at the crane to identify the problem, the chainmail strap snapped loose and hit the claimant, striking him in the face and chest. The blow knocked him backwards, knocked out four of his teeth (including three of his upper front teeth and one lower tooth), loosened other teeth, and caused multiple facial fractures and chest contusions.

¶ 7     After the accident, the claimant was taken by ambulance to St. Francis Medical Center where he was noted to have facial and dental fractures and a large laceration of his lower lip extending into his chin. Diagnostic studies showed multiple fractures of his right maxillary sinus and right maxilla, as well as hemorrhage within the right maxillary sinus, the loss of four teeth, and a left chest wall contusion. The claimant's mouth laceration was repaired and he was discharged with prescriptions for pain medications and follow-up recommendations.

¶ 8     The claimant was off work from September 12, 2012, until October 16, 2012, when he returned to work under light duty restrictions.  On December 14, 2012, the claimant was released to work full duty with no restrictions. He was still undergoing treatment for his work-related injuries at that time.  During the next 13 months, the defendant underwent four surgical procedures to his face and mouth to correct his pallet and maxilla and to prepare for the insertion of permanent dental implants. The claimant also treated with a dentist and underwent several attempts at restoring his teeth.  Prior to the claimant's termination in October 2013, the employer paid the claimant TTD benefits while he was off work following surgeries.[1]

¶ 9     After his return to work in October of 2012, the claimant felt uncomfortable operating cranes and he asked his supervisor not to assign him any crane duties. For the most part, the employer accommodated the claimant's request.  The claimant was reassigned to work a different shift in another building where there were no overhead cranes.  The claimant testified that he "may have" operated a large, overhead crane a few times in late 2012 and early 2013.

---

[1] For example, the employer paid the claimant TTD benefits while he was off work following dental surgery from May 23, 2013 through June 12, 2013.  However, the employer did not pay the claimant TTD while he was off work following another dental surgery from November 13, 2013, through November 20, 2013 (after the claimant's termination).  Those TTD benefits are at issue in this case.

Nevertheless, although the claimant was still classified as a transportation operator, operating cranes was no longer part of his regular duties at that time. He primarily operated a fork truck.

¶ 10    In May 2013, however, the claimant was reassigned to his former job in the building where his work accident had occurred. The claimant discussed his fear of operating cranes with his new foreman, Ken Hoppe. Hoppe generally cooperated with the claimant's request to avoid working with cranes. Eventually, however, the claimant was required to operate a crane on two or three occasions. Each time he did so, the claimant experienced considerable anxiety, his chest tightened, and his heart raced. On July 3, 2013, the claimant experienced a panic attack while operating the same 40-ton overhead crane that had injured him. He was so shaken afterwards that he immediately visited the onsite occupational nurse, Lori Akers, and asked to be sent to the emergency room. Another nurse diagnosed an anxiety attack and took the claimant off work until he was cleared by his primary care physician, Dr. Alain Vilatte.

¶ 11    On July 11, 2013, the claimant treated with Dr. Vilatte. The claimant reported that, during the six weeks following his return to the same job that had caused his work injury, he had been experiencing increasing anxiety with palpitations, agitation, racing thoughts, feelings of losing control, and difficulty concentrating. Dr. Vilatte noted that the claimant was experiencing panic attacks and anxiety while doing his job. He prescribed an anti-anxiety medication and recommended that the claimant undergo counseling. He also recommended that the claimant be placed at another job while he adjusted to the medication.

¶ 12    Thereafter, the claimant asked the employer to reassign him to a different position. The employer offered the claimant a full-time janitorial position at its Peoria facility, which would not require the claimant to work on or near cranes. The claimant declined that position and continued to work for the employer as a transportation operator. He was not required to operate cranes.

¶ 13    On July 22, 2013, the claimant was evaluated by Dr. Edward Moody, a physician at OSF Occupational Health who had previously served as the employer's company doctor. Dr. Moody concluded that it was "the operation of the crane in question" that was provoking the claimant's anxiety.  He cleared the claimant for full duty janitorial work and recommended a restriction of no crane operation for six to eight weeks if he returned to his previous position as a transportation operator.  Thereafter, the claimant returned to work as a transportation operator primarily driving fork trucks.  He was not required to operate overhead cranes.

¶ 14    On August 13, 2013, the claimant began counseling sessions with Jennifer Boehs, a Licensed Clinical Social Worker, for his crane-related anxiety. On September 18, 2013, Boehs diagnosed the claimant with post-traumatic stress disorder as a result of his work injury. She recommended that the claimant avoid operating a crane for at least one year.  Boehs opined that, if the claimant did need to operate a crane, he should do so gradually in order to build his tolerance.

¶ 15    In early October 2013, the claimant took a scheduled vacation to Mexico.  When he returned, he was ill with severe nausea and diarrhea.  He missed work from Tuesday, October 8, 2013, through Friday, October 11, 2013.  He also missed the first four hours of his shift on Monday, October 14, 2013.  Although he called in sick on October 8, he failed to notify the employer that he was unable to work his scheduled shifts from October 9 through October 11.[2] The collective bargaining agreement (CBA) between the employer and the claimant's union provided that an employee's failure to call in or report to work for three consecutive days is grounds for termination of employment.  On October 15, 2013, the employer terminated the claimant pursuant to this contractual provision.  During the arbitration hearing, the claimant

---

[2] The claimant testified that he did not call in sick from October 9 through October 11 because he was under the impression that his doctor's office had faxed an off-work slip to the employer.  He did not bring a doctor's note to the employer until October 12.

testified that he was aware of the terms contained in the CBA, including the provision authorizing termination for three consecutive days of "no call, no show."

¶ 16   The claimant underwent another dental surgery on November 13, 2013. His dental surgeon, Dr. John Otten, took the claimant off work completely from November 13, 2013, through November 20, 2013.

¶ 17   On January 9, 2014, the claimant underwent a psychological evaluation with Dr. Nancy Landre, a clinical psychologist who served as the employer's section 12 examiner. After ruling out any malingering or exaggeration of symptoms by the claimant, Dr. Landre opined that the claimant satisfied the criteria for an adjustment disorder with mixed anxiety and depression. She further opined that it was reasonable to conclude that the claimant's current anxiety symptoms were attributable to his injury on September 11, 2012. Based on an oral description of the claimant's job duties, Dr. Landre concluded that the claimant was able to perform all of the duties required in his usual occupation except for operating a crane. Dr. Landre placed the claimant on full duty with the restriction that he not be required to operate a crane for six months.

¶ 18   An arbitration hearing took place on January 29, 2014. During the hearing, the claimant testified that he continued to treat with a dentist and was in the process of obtaining dental implants. He was still missing his top three center teeth and one lower tooth. He had an appointment scheduled with Dr. Otten on February 7, 2014. Dr. Otten was considering extracting an additional bottom tooth that had been loosened and moved during the work accident. The claimant also stated that he was still attending counseling sessions with Jennifer Boehs.

¶ 19    The claimant testified that, since his termination, he had been actively seeking work for positions within his union. He stated that he had some promising leads out of state, in San Diego, but had made no effort to find employment near his home in central Illinois.

¶ 20    The claimant further testified that, from the time he returned to work on July 23, 2013, until his termination October 15, 2013, the employer did not require him to operate an overhead crane.

¶ 21    Chris Dubois, the employer's Human Resource Manager, testified on behalf of the employer. Dubois stated that the employer allowed its employees to request reassignment for different positions that matched their qualifications. Dubois testified that, following the claimant's appointment with Dr. Villate in July 2011, the claimant requested reassignment and was offered a janitorial position that would not require him to work on or near cranes. The janitorial position was permanent, full-time, and unionized, and it paid the same wage as the claimant's previous position as a transportation operator. However, according to Dubois, the claimant declined to accept the janitorial position.

¶ 22    Dubois testified that the claimant's work restriction barring him from operating cranes did not preclude the claimant from performing the regular duties of the transportation operator position. Dubois stated that there were 40 positions at the employer's Peoria manufacturing facility that were classified as "transportation operator" positions. Approximately one-third of these positions required crane operation as a regular job duty. The remaining two-thirds of the transportation operator positions primarily involved package handling and did not include crane operation as a regular job duty. Dubois testified that, when the claimant returned to work on July 23, 2013, under the "no crane operation" work restriction, he was still classified as a "transportation operator" but he was not required to operate a crane as part of his regular duty.

¶ 23    Alia Massat, a certified rehabilitation counselor, also testified on behalf of the employer. Massat testified that, based on the claimant's job experience, job description, and medical evaluations, the claimant's restriction of no crane operation did not preclude the claimant from reentering the work force. Based on a labor market survey she conducted, Massat opined that there were various employers in Peoria who were hiring for positions that matched the claimant's qualifications, salary, and restriction of no crane operation.

¶ 24    The arbitrator found that the claimant was entitled to receive TTD benefits from the time he was terminated by the employer until the date of arbitration, a period of 15 and 1/7 weeks. The arbitrator noted that, as of the date his employment was terminated by the employer, the claimant had not been released to unrestricted full duty work. Although the claimant had been released to return to work with restrictions and he was able to perform that work, the arbitrator stressed that none of the physicians who examined or treated the claimant indicated that he had reached maximum medical improvement (MMI). Moreover, the arbitrator found that the medical evidence established that the claimant "continue[d] to be treated for his injuries and * * * continue[d] to experience symptoms connected with his work related injury." Thus, the arbitrator concluded that the claimant's condition had not stabilized as of the date his employment was terminated by the employer, and awarded TTD benefits on that basis.

¶ 25    The arbitrator determined that, in the year preceding the injury, the claimant earned an average weekly wage of $982.78.  The arbitrator declined to impose attorney fees and penalties under sections 16, 19(k), and 19(l) of the Act (820 ILCS 305/16, 19(k), 19(l) (West 2012)) because it found that the employer's failure to pay TTD "was not unreasonabe and vexatious or without good and just cause."

¶ 26    The claimant and the employer each sought review of the arbitrator's decision before the Commission.  The claimant appealed the arbitrator's calculation of his average weekly wage and

the denial of his claims for penalties and attorney fees. The employer appealed the arbitrator's award of TTD benefits and also appealed the arbitrator's calculation of the claimant's average weekly wage. The Commission unanimously reversed the arbitrator's award of TTD benefits and its calculation of the claimant's average weekly wage,[3] and affirmed the arbitrator's denial of penalties and attorney fees.

¶ 27    As to TTD benefits, the Commission noted that the claimant had sought TTD benefits after he was terminated for reasons unrelated to his work injury pursuant to the Illinois Supreme Court's decision in *Interstate Scaffolding, Inc. v. Illinois Workers' Compensation Commission*, 236 Ill. 2d 132 (2010) "on the basis that his work-related condition had not yet stabilized." The Commission acknowledged *Interstate Scaffolding*'s holding that an employer's obligation to pay TTD benefits to an injured employee does not cease because the employee had been discharged—whether or not the discharge was for "cause." However, relying upon *Interstate Scaffolding*, the Commission noted that: (1) when an injured employee has been discharged by his employer, "the determinative inquiry for deciding entitlement to [TTD] benefits remains, as always, whether the claimant's condition has stabilized";and (2) an injured employee is entitled to TTD benefits after termination "if [he] is able to show that he continues to be temporarily totally disabled as a result of his work-related injury."

¶ 28    The Commission found *Interstate Scaffolding* to be distinguishable from the claimant's case in several material respects. In *Interstate Scaffolding*, "the claimant's ability to find work in the open labor market was significantly limited or precluded by his work-related condition." Here, by contrast, the Commission noted that the claimant had "offered no evidence that he was significantly limited or precluded from reentering the labor market because he needed to

---

[3] The Commission found that the claimant's average weekly wage was $1,008.34, not $982.78, as the arbitrator had found.

temporarily avoid cranes." The claimant offered "no explanation at all for why he had been unable to secure employment since termination, despite testifying that he performed a self-directed job search and locating potential employers." The Commission found it significant that the employer's vocational expert testified that a labor market survey "found several employers within the Peoria area who were hiring for positions that matched [the claimant's] qualifications and salary and did not involve crane usage." Furthermore, the Commission noted that neither the claimant nor the employer's vocational expert had "indicated that [the claimant's] need for dental care had any impact on his employability in his usual and customary field of employment."

¶ 29 Although the Commission acknowledged that, like the employee in *Interstate Scaffolding*, the claimant "had yet to reach [MMI] at termination,"[4] it concluded that "[MMI] is not alone dispositive on the issue of whether a claimant's condition has stabilized." The Commission found that: (1) the claimant was working full duty within his job classification of "transportation operator" until he was terminated;[5] (2) he performed one of the numerous jobs that did not involve any crane usage; (3) it was not necessary for the employer to either modify an existing job or create an accommodating job on account of the claimant's work restrictions; (4) after he returned to work following his panic attack, the claimant "continued working for [the employer] as a transportation operator while entirely avoiding cranes"; and (5) "the employer's representative, Mr. Dubois, testified credibly that [the claimant] could have continued to work for [the employer] indefinitely without any mandatory crane exposure." Accordingly, the

---

[4] The Commission observed that the claimant had not been placed at MMI by the date of his termination because he required additional dental work and continued to have symptoms of anxiety.

[5] The Commission noted that it was undisputed that "transportation operator" is a job classification that "encompasses many different jobs within [the employer's] company" and that many such jobs "do not involve any work with cranes."

- 10 -

Commission found that "[t]he evidence shows that at termination, [the claimant's] work related injuries had stabilized and had no impact on his employment."

¶ 30    The claimant then sought judicial review of the Commission's decision before the circuit court of Peoria County.  The circuit court reversed the Commission's denial of TTD benefits and adopted the arbitrator's award of TTD benefits.  The court also reversed the Commission's calculation of the claimant's average weekly wage[6] and affirmed the Commission's denial of penalties and attorney fees.

¶ 31    This appeal followed.

¶ 32                                ANALYSIS

¶ 33    On appeal, the employer argues that the Commission's denial of TTD benefits after the claimant's termination was not against the manifest weight of the evidence and that the circuit court therefore erred in reversing the Commission's decision on that issue.

¶ 34    An employee is temporarily totally incapacitated from the time an injury incapacitates him from work until such time as he is as far recovered or restored as the permanent character of injury will permit. *Archer Daniels Midland Co. v. Industrial Comm'n*, 138 Ill. 2d 107, 118 (1990); *Shafer v. Illinois Workers' Compensation Comm'n*, 2011 IL App (4th) 100505WC, ¶ 45. To be entitled to TTD benefits, it is the claimant's burden to prove not only that he did not work but also that he was unable to work.  *Shafer*, 2011 IL App (4th) 100505WC, ¶ 45; *McDaneld v. Industrial Comm'n*, 307 Ill. App. 3d 1045, 1053 (1999).  A TTD award is proper when the claimant cannot perform any services except those for which no reasonably stable labor market exists. *Archer Daniels Midland Co. v. Industrial Comm'n*, 138 Ill. 2d at 118; *Zenith Co. v. Industrial Comm'n*, 91 Ill. 2d 278, 287 (1982); *McDaneld*, 307 Ill. App. 3d at 1053; *Ingalls*

---

[6] The circuit court concluded that the claimant's average weekly wage was $1,063.91.

*Memorial Hospital v. Industrial Comm'n*, 241 Ill. App. 3d 710, 716 (1993). "The fundamental purpose of the Act is to provide injured workers with financial protection until they can return to the work force." *Interstate Scaffolding*, 236 Ill. 2d at 146; *Flynn v. Industrial Comm'n*, 211 Ill. 2d 546, 556 (2004). "Therefore, when determining whether an employee is entitled to TTD benefits, the test is whether the employee remains temporarily totally disabled as a result of a work-related injury and whether the employee is capable of returning to the work force." *Interstate Scaffolding*, 236 Ill. 2d at 146.

¶ 35     Whether a claimant is entitled to TTD benefits and for how long are questions of fact to be determined by the Commission, and a reviewing court will not disturb the Commission's determination of these issues unless they are contrary to the manifest weight of the evidence. *Archer Daniels Midland*, 138 Ill.2d at 119–20; *Shafer*, 2011 IL App (4th) 100505WC, ¶ 45; *McDaneld*, 307 Ill. App. 3d at 1053. A factual finding is contrary to the manifest weight of the evidence only when an opposite conclusion is clearly apparent. *Durand v. Industrial Comm'n*, 224 Ill. 2d 53, 64 (2006). The test is whether there is sufficient factual evidence in the record to support the Commission's determination, not whether this court, or any other tribunal, might reach an opposite conclusion. *Pietrzak v. Industrial Comm'n*, 329 Ill. App. 3d at 828, 833 (2002); *Beattie v. Industrial Comm'n*, 276 Ill. App. 3d 446, 450 (1995). The determination of witness credibility and the weight to be accorded the evidence are matters within the province of the Commission. *Pietrzak*, 329 Ill. App. 3d at 833; *Presson v. Industrial Comm'n*, 200 Ill. App. 3d 876, 880 (1985).

¶ 36     Applying these standards, we cannot say that the Commission's decision to deny TTD benefits after the claimant's termination on October 15, 2013, was against the manifest weight of the evidence. It is undisputed that, at the time of his termination, the claimant had not reached MMI and he was still undergoing dental treatments and attending counseling sessions for his

crane-related anxiety. (The claimant testified that he was still undergoing dental treatments and counseling at the time of arbitration.) However, it is also undisputed that, from the time he returned to work for the employer after his panic attack in July 2013 until his termination on October 15, 2013: (1) the claimant had been released to work fully duty with only one work restriction, *i.e.,* that he not operate a crane; (2) the claimant continued to work full duty as a "transportation operator" within his original job classification without being required to operate a crane; and (3) it was not necessary for the employer to either modify an existing job or create a "light duty" job to accommodate the claimant's work restrictions. Moreover, DuBois, the employer's Human Resources Manager, testified that the claimant could have continued to work for the employer in his current position without being required to operate a crane.

¶ 37　In addition, the employer's vocational expert testified that, based on the claimant's job experience, job description, and medical evaluations, the claimant's restriction of no crane operation did not preclude the claimant from reentering the work force. Based on a labor market survey she conducted, the employer's vocational expert opined that there were various employers in Peoria who were hiring for positions that matched the claimant's qualifications, salary, and restriction of no crane operation. The claimant did not dispute that he was employable despite his current work-related physical and psychological conditions. To the contrary, he testified that he had been actively conducting a job search and already had some promising leads in San Diego.

¶ 38　Accordingly, there was ample evidence to support the Commission finding that, at the time of his termination, the claimant's work-related injuries had stabilized to the extent that he was able to reenter the workforce and his injuries had no impact on his employment. The Commission's decision to deny the claimant's claim for TTD benefits after his termination was not against the manifest weight of the evidence, as the opposite conclusion is not "clearly

- 13 -

apparent." *See*, *e.g.*, *Lukasik v, Industrial Comm'n*, 124 Ill. App. 3d 609, 615 (1984) (holding that the Commission's decision to terminate TTD benefits after two doctors released the claimant for light-duty work was not against the manifest weight of the evidence, even though "the record reflect[ed] that the claimant may not have fully recovered" from his work-related injuries, because the Commission "could properly have determined that he was no longer totally disabled and unable to work" at that time); see also *Gallentine v. Industrial Comn'n*, 201 Ill. App. 3d 880, 887 (1990); *Rambert v. Industrial Comm'n*, 133 Ill. App. 3d 895, 902-03 (1985).

¶ 39    Relying on *Interstate Scaffolding* and *Matuszczak* v. *Illinois Workers' Compensation Comm'n*, 2014 IL App (2d) 130532WC, the claimant argues that: (1) the only dispositive question is whether the claimant had reached MMI prior to his termination; and (2) because he had not, the Commission erred as a matter of law in denying him TTD benefits after his termination.  We disagree.  It is true that *Interstate Scaffolding* and *Matuszczak* each state that "when a claimant seeks TTD benefits, the dispositive inquiry is whether the claimant's condition has stabilized, *i.e.*, whether the claimant has reached maximum medical improvement." *Interstate Scaffolding*, 236 Ill. 2d at 142; *Matuszczak*, 2014 IL App (2d) 130532WC, ¶ 14.  It is also true that, in each of those cases, the reviewing court held that TTD benefits be continued after the claimant's termination for cause even though the claimant was working light duty at the time.  However, *Interstate Scaffolding* and *Matuszczak* are each distinguishable from the instant case in material respects.  In both *Interstate Scaffolding* and *Matuszczak,* the question was whether the claimant's termination for conduct unrelated to the claimant's injury cut off the claimant's preexisting entitlement to TTD benefits.  In each of those cases, it was undisputed that, at the time of termination, the claimant's condition had not stabilized, that the claimant was unable to perform the job he had been performing for the employer prior to the work accident, and that when the claimant returned to work after the accident, it was in a light duty capacity.

Thus, in each case, it was undisputed that the claimant's work injury had diminished his ability to work, thereby entitling him to collect TTD benefits at the time of his termination. The only question was whether the misconduct that led to the claimant's termination in each case (writing religious graffiti in the employer's store room in *Interstate Scaffolding*, and stealing cigarettes in *Matuszczak*) justified the termination of TTD benefits. Here, by contrast, the claimant was working *full time* and *full duty* in his original job classification prior to his termination, and the employer's vocational expert testified that the claimant's work-related injuries did not affect his employability in the labor market. Thus, the dispositive question is this case is whether the claimant was entitled to TTD benefits as a result of his work injuries in the first place, irrespective of his termination or the reasons for his termination. As noted above, the Commission's finding that the claimant was not entitled to TTD benefits in this case because his work injuries had no effect on his employment was not against the manifest weight of the evidence.

¶ 40 Moreover, *Interstate Scaffolding* does not support the claimant's argument that an injured employee is entitled to TTD as a matter of law unless he had reached MMI. Near the beginning of its analysis in *Interstate Scaffolding*, the supreme court states that, when a claimant seeks TTD benefits, the "dispositive inquiry is whether the claimant's condition has stabilized," *i.e.*, whether the claimant has reached [MMI]." *Interstate Scaffolding*, 236 Ill. 2d at 142. However, later in its analysis, the supreme court clarified that an injured employee is entitled to TTD benefits "if [he] is able to show that he continues to be temporarily totally disabled as a result of his work-related injury" (*id.* at 149), and that "when determining whether an employee is entitled to TTD benefits, the test is whether the employee remains temporarily totally disabled as a result of a work-related injury *and whether the employee is capable of returning to the work force*" ((Emphasis added.) (*id.* at 146). Moreover, the supreme court also noted that, in two prior appellate court decisions

- 15 -

upon which it relied, "the touchstone for determining whether the claimants were entitled to TTD benefits was * * * whether the claimants' conditions had stabilized *to the extent that they were able to reenter the workforce.*"  (Emphasis added.)  *Id.* at 148.  Thus, like *Archer Daniels Midland*, *Zenith Co.*, *Schafer*, *McDaneld*, *Lukasik*, and other cases, *Interstate Scaffolding* confirms that a claimant is not entitled to receive TTD benefits when his work injuries no longer impact his ability to work or his employability.

¶ 41   One final point bears mentioning.  The claimant argues that we should review the Commission's decision *de novo* because the facts are undisputed and no conflicting inferences may be drawn from the facts. We disagree.  Although the claimant was able to work within his original job classification without operating cranes when he returned to work in July 2013, he had not yet reached MMI and he continued to undergo dental treatments thereafter, including at least one dental surgery in November 2013 that kept him off work entirely for one week. Moreover, although the operation of overhead cranes was no longer part of the claimant's regular job duties after July 2013, and it was undisputed that the claimant was not required to operate a crane between July 23, 2013, and his termination, it was not undisputed that the claimant would *never* have had to operate a crane in his capacity as a transportation operator. Accordingly, the record supported conflicting inferences as to whether the claimant's injuries had stabilized to the extent that he was no longer entitled to TTD benefits.  We have therefore reviewed the Commission's decision under the manifest weight of the evidence standard.

¶ 42                           CONCLUSION

¶ 43   For the foregoing reasons, we reverse the judgment of the circuit court, which reversed the decision of Commission, and reinstate the Commission's decision.

¶ 44   Circuit court's judgment reversed; Commission's decision reinstated.